941 So.2d 1109 (2006)
Patrick Charles HANNON, Appellant,
v.
STATE of Florida, Appellee.
Patrick Charles Hannon, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-893, SC04-1662.
Supreme Court of Florida.
August 31, 2006.
Rehearing Denied October 27, 2006.
*1115 Neal A. Dupree, Capital Collateral Regional Counsel, and Suzanne Myers Keffer, Assistant CCRC-South, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Katherine V. Blanco, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Patrick Charles Hannon appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.[1] Hannon *1116 also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

FACTUAL AND PROCEDURAL HISTORY
Patrick C. Hannon was convicted of the first-degree murders of Brandon Snider and Robert Carter. See Hannon v. State, 638 So.2d 39, 41 (Fla.1994). The jury unanimously recommended the death penalty. See id. Following that recommendation, the trial court imposed separate death sentences on Hannon for the murders of Snider and Carter. See id. On direct appeal, this Court affirmed Hannon's convictions and sentences. See id. at 44. There, the Court detailed the facts surrounding the murder:
Around Christmas 1990, Brandon Snider, a resident of Tampa, went to Indiana to visit relatives. While there, he went to the home of Toni Acker, a former girlfriend, and vandalized her bedroom. On January 9, 1991, Snider returned to Tampa.
On January 10, 1991, Hannon, Ron Richardson, and Jim Acker went to the apartment where Snider and Robert Carter lived. Snider opened the door and was immediately attacked by Acker, who is Toni Acker's brother. Acker stabbed Snider multiple times. When Acker was finished, Hannon cut Snider's throat. During the attack, Snider's screams drew the attention of his neighbors. They also drew the attention of Carter, who was upstairs. Hearing the screams, Carter came downstairs and saw what was happening. He then went back upstairs and hid under his bed. Hannon and Acker followed Carter upstairs. Then Hannon shot Carter six times, killing him.
In July 1991, Hannon was brought to trial for the murders of Snider and Carter. [N. 1] During the trial, Richardson reached an agreement with the State. He pled guilty to being an accessory after the fact and testified against Hannon. Hannon was found guilty of both murders. After a penalty proceeding, the jury unanimously recommended death.
[N. 1] Acker was tried in a separate proceeding, was convicted, and was sentenced to two life sentences.
Id. at 41.
In sentencing Hannon to death, the trial judge found three aggravating circumstances applicable to both the murders of Snider and Carter(1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel (HAC). See id. With regard to Carter, the trial court found the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. See id. In mitigation, the trial court considered testimony from Hannon's mother and father that Hannon was not a violent person and also considered that Hannon's original codefendant, Richardson, was no longer facing the death penalty. See id. The trial court found no statutory mitigating factors. See id. The trial court found that the aggravating factors outweighed the mitigating factors and sentenced Hannon to death for each murder. See id. On direct appeal, this Court upheld Hannon's convictions and sentences. See id. at 44.
On direct appeal, Hannon asserted the following issues: the trial court erred in striking prospective jurors Ling and Troxler for cause; the trial court erred in *1117 admitting certain statements by a prosecution witness, over defense objection; the trial court erred in admitting into evidence the bloody shorts and shirt worn by Snider when he was murdered and the testimony of Judith Bunker, a forensic consultant in the field of blood stain pattern analysis and crime scene reconstruction; the HAC instruction given to the jury was unconstitutionally vague; the facts of the instant case did not support the finding of HAC; the evidence did not support the aggravating circumstance that the murder of Carter was committed for the purpose of avoiding or preventing lawful arrest; Florida's HAC aggravating circumstance itself is unconstitutionally vague, is applied in an arbitrary and capricious manner, and does not genuinely narrow the class of persons eligible for the death penalty; the facts do not support the prior violent felony aggravating factor; and the sentencing order was insufficient. See id. at 41-44. This Court denied all of Hannon's claims. See id.

MOTION FOR POSTCONVICTION RELIEF
On March 17, 1997, Hannon filed a shell motion for postconviction relief presenting 34 claims. Hannon filed an amended motion to vacate judgment on April 10, 2000, presenting 21 claims.[2] A Huff[3] hearing *1118 was held on November 16, 2001.[4] On that same day, the trial court issued an order reflecting its determination that an evidentiary hearing was required to address seven of Hannon's claims.[5] The evidentiary hearing was conducted on February 18, 2002, and June 21, 2002. On February 3, 2003, the trial court issued an order denying Hannon postconviction relief. This appeal followed.

I. Ineffective Assistance of Counsel Pretrial and During the Guilt Phase
Hannon asserts that his trial counsel, Joseph Episcopo, provided ineffective assistance in failing to depose Ron Richardson or request a continuance; in failing to adequately prepare for the State's blood spatter expert, Judith Bunker; and in failing to question Michelle Helm with regard to Ron Richardson's alleged jealousy. Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards.
Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings (if they are supported by competent, substantial evidence), but reviewing the circuit court's legal conclusions de novo. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999).
There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. A fair assessment of attorney performance requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." *1119 Id. It is under this legal framework that Hannon's claims are addressed.

A. Failure to Depose Ron Richardson or Request a Continuance
Hannon asserts that trial counsel was deficient in failing to depose Ron Richardson after discovering during trial that Richardson was to testify against Hannon. Hannon claims that trial counsel had a duty to investigate Richardson's relationship with Hannon and his influence on Hannon, as well as to impeach Richardson. This Court has held that "when a failure to depose is alleged as a part of an ineffective assistance of counsel claim, the appellant must specifically set forth the harm from the alleged omission." Brown v. State, 846 So.2d 1114, 1124 (Fla.2003) (citing Magill v. State, 457 So.2d 1367, 1370 (Fla.1984)).
At the evidentiary hearing, Hannon's trial counsel testified that the defense theory was an alibi defense, specifically that neither Hannon nor Richardson was at the crime scene when the crimes were committed, and that both Hannon and Richardson were playing a drinking game at Richardson's house the night of the crimes.[6] Trial counsel testified that he did not direct any investigation into Richardson's background and did not remember if he had ever obtained Richardson's criminal history before the trial began. Trial counsel further testified that he did not obtain any additional investigative material concerning Richardson's relationship with Hannon after Richardson, in a surprise move, turned to testify for the State during trial. Trial counsel stated that the trial judge offered him an opportunity to depose Richardson after the State disclosed during trial that Richardson would be presented as a witness for the State but Hannon's trial counsel decided that he would not conduct a deposition at that point because he believed Richardson's story was totally fabricated, and that his best trial strategy was to question Richardson immediately in the presence of the jury instead of creating an opportunity for Richardson to rehearse his testimony during a deposition.
Counsel cannot be deemed ineffective merely because postconviction counsel disagrees with trial counsel's strategic decisions. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. . . ."); Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) ("The standard is not how present counsel would have proceeded, in hindsight. . . ."). In Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."
The record demonstrates important time factors, although not considered by the dissent, and shows that on Friday, July 19, 1991, during the guilt phase of the trial, the State indicated for the first time to the trial court that it had received information that Richardson, who was listed as a defense witness for the trial in this case, might reverse himself and decide to be a prosecution witness against Hannon. On the morning of Monday, July 22, 1991, prior to resting its case, the State listed *1120 Richardson as a witness and at that late date provided Hannon's counsel with a copy of a statement by Richardson that had been taken only hours before at 8 p.m. the prior evening. The State had entered into an agreement with Richardson in which he would enter a guilty plea to one count of accessory after the fact and in return receive a sentence of only five years in prison in exchange for his testimony against Hannon.
At that point, Hannon's counsel, believing that the evidence would disclose to the jury that Richardson's story was clearly fabricated for purposes of obtaining the "deal" with the State, decided that his best strategy was to continue with the innocence defense and the alibi basis. Trial counsel testified at the evidentiary hearing that he consciously and strategically decided that he would not depose Richardson after this last-minute turn of events because it was his strategy and approach to now use the element of total surprise in questioning Richardson with regard to the details of the crime and prevent the State from using the deposition to better prepare Richardson for his trial testimony. Moreover, trial counsel related that Richardson was an integral part of Hannon's alibi defense and, thus, his strategy and goal after Richardson turned to assist the State was to demonstrate and emphasize that Richardson was not familiar with any of the details of the crime scene, thereby bolstering Hannon's argument that neither Richardson nor Hannon was at the scene and that Richardson had changed his story to procure his last-minute agreement with the State. Trial counsel also testified that he was not interested in attempting to portray Richardson as a bad person or as a guilty party before the jury because that would also undermine Hannon's alibi defense, which was predicated on Hannon drinking with Richardson at the time of the murders. Hannon's trial counsel testified that his trial tactic and examination of Richardson was in fact ultimately successful, which the dissent does not consider, because on cross-examination, the defense elicited that Richardson actually knew very little with regard to the victims' apartment:
Q. Please describe Mr. Snider and Mr. Carter's apartment or house, apartment house.
A. I'm sorry. I can't do that. I'm not familiar with their apartment house. I've only been there one time prior to thisthis deal.
Q. So you can't describe any of the rooms?
A. Well, as you come in, you come straight into the living room, but that's as far as I've ever been in that house.
Q. What color was the furniture?
A. II couldn't tell you.
Q. Did you ever notice any exercise equipment inside that apartment?
A. No.
Q. What kind of video equipment was in there?
A. II wasn't familiar with the apartment.
. . . .
Q. Where was the aquarium located in that apartment?
A. I'm not that familiar with that apartment, Joe. I couldn't tell you.
Further, Richardson conveniently testified that he was leaving the apartment as the shooting of Snider occurred. Hannon's counsel also testified that it was his intention to impeach Richardson with the testimony of his brother, Mike, who was expected to testify that Hannon and Richardson were at Richardson's house at the time of the murder playing a drinking game. Hannon's counsel further stated that he chose not to request a continuance *1121 to investigate Richardson after he was disclosed to be a witness for the State because he believed a continuance would only give the State an edge by affording the State additional time to prepare Richardson for trial testimony to the detriment of his client, also a factor not considered by the dissent.
The record supports trial counsel's testimony that Richardson was unable to provide any meaningful details of the victims' apartment for the jury. The record also clearly demonstrates that Hannon's counsel successfully revealed to the jury that Richardson had previously supported Hannon's alibi by stating that he and Hannon were playing a drinking game the night of the murders, and that he was not involved with the murder. Moreover, counsel elicited from Richardson that up until even the night before he testified, he denied seeing the wounds to Snider's throat, but within twenty-four hours had completely changed his story. Richardson claimed that he suddenly remembered the wounds; however, it cannot be disregarded that Richardson's memory was restored just in time for him to testify for the State in the case against Hannon. Further, when asked about his drastic change in testimony, Richardson affirmatively testified that he had lied not once, but several times previously. Finally, counsel highlighted to the jury that on the Sunday morning before Richardson's new testimony he was facing the death penalty for two counts of first-degree murder, but by the evening of that same day, in exchange for his testimony against Hannon, Richardson had received a "deal" for only five years in prison.
Clearly, the record supports a carefully considered and planned defense strategy on behalf of Hannon by his trial counsel and provides a full and proper basis for the trial court's determination that Hannon failed to meet the first prong of Strickland in that he has failed to prove that counsel acted deficiently when he made a strategic decision not to take further steps with regard to Mr. Richardson, look into his background, determine his motive for testifying, or develop further information that could have been used to impeach him. Although current counsel may disagree with trial counsel's strategy at that time and would have chosen to abandon the alibi defense when Richardson changed at the last minute to assist the State during trial, such current disagreement does not render trial counsel's performance deficient. Accordingly, we conclude that Hannon has failed to demonstrate that trial counsel was deficient in strategically deciding not to depose Richardson, not to seek a continuance, or otherwise conduct an investigation into Richardson's background.
Moreover, Hannon has failed to demonstrate any prejudice because he has not even suggested what evidence or information trial counsel would have procured had he deposed Richardson, or requested a continuance, or conducted further investigation, that would have so affected the proceeding that confidence in the outcome is undermined, nor does the dissent provide any insight into the subject. See Maxwell, 490 So.2d at 932. Based upon the foregoing analysis, this claim has no merit.

B. Failure to Adequately Prepare for State's Blood Spatter Expert
Hannon asserts that his trial counsel acted deficiently in failing to investigate the credentials of the State's blood spatter expert, Judith Bunker, as well as failing to question her credentials and challenge her testimony at trial. To satisfy the deficiency prong of Strickland, Hannon must demonstrate that trial counsel's representation "fell below an objective *1122 standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
At the evidentiary hearing, trial counsel testified that he was aware that Bunker had been hired as the State's expert but decided not to conduct an investigation into Bunker's credentials because her testimony regarding the blood spatter at the crime scene was totally irrelevant to Hannon's alibi defense that he was not at the crime scene on the night of the murders, a factor not considered by the dissent. Trial counsel stated that he did not obtain Bunker's personnel file, was not aware whether Bunker ever completed high school or attended college, and had not seen a group of letters indicating that Bunker had not worked at various places or lectured at certain places as represented on her resume. Trial counsel stated at the postconviction evidentiary hearing that he most likely would not have used this information regarding Bunker to impeach her at trial. Although confronting this witness with this type of information would have made him look sharp, it would not have advanced Hannon's defense in any way and would have only left the jury wondering why counsel was even taking the time to question Bunker if she truly had nothing to do with Hannon's defense. The dissent provides no explanation for this gap. Trial counsel further testified that he chose not to question Bunker's credentials at trial to avoid giving the jury the impression that he was attempting to present an inconsistent defense. Trial counsel testified that Bunker's testimony did not adversely impact Hannon's defense because Bunker was never able to confirm any of the victims' blood on Hannon. He did object to the introduction of crime scene photographs because he believed the photographs were being admitted simply to emphasize the goriness of the crime but decided not to cross-examine Bunker with regard to these photographs. The defense strategy was to continue with the theory that Hannon was not at the crime scene and, therefore, cross-examining this witness would only confuse the jury with regard to why he was attacking a witness that was not at all relevant to Hannon's case.
Based on trial counsel's testimony at the postconviction evidentiary hearing, Hannon has failed to demonstrate that trial counsel acted deficiently when he made these strategic decisions with regard to witness Bunker. Trial counsel's performance did not fall below a standard of reasonableness in failing to challenge the credentials of a witness who was not at all relevant to any aspect of Hannon's defense that he did not commit the murders and was not present at the victims' apartment at the time of the murders. These reasonable strategic decisions were made in an attempt to avoid confusing the jury by attacking a witness that was not relevant to the defense case. Again, current counsel disagrees with the strategy and would have made the decision to challenge Bunker's credentials, but the evidence does not support the conclusion that trial counsel's performance was deficient. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Moreover, trial counsel's tactical decision not to challenge or impeach Bunker's blood spatter testimony was reasonable because Bunker's testimony did not implicate Hannon in the murders, nor was it even an element in the State's case against Hannon.
Hannon has also failed to demonstrate prejudice with regard to these strategic decisions. This Court on direct appeal determined that Bunker's testimony relating to the blood spatter evidence was properly admitted at Hannon's trial only to assist the jury in understanding the facts. See Hannon, 638 So.2d at 43. Furthermore, *1123 this Court has previously determined in other cases that the presentation of Bunker's allegedly exaggerated credentials to a jury has little effect on the outcome, given that she has been recognized as a blood spatter expert in numerous other cases. See Correll v. State, 698 So.2d 522, 523-24 (Fla.1997); see also Gorby v. State, 819 So.2d 664, 677 (Fla.2002). In Correll, this Court stated:
[T]he discrepancies between the level of education, training, and experience Bunker testified to at trial and the asserted level of education, training, and experience she actually had were not so great as to make any difference in the outcome of the case. Moreover, Bunker's vita, which among other things, falsely set forth that Bunker had a high school diploma, was never seen by the jury. Thus, any misrepresentations contained in the vita are irrelevant to Correll's claim.
The only alleged misrepresentation of any import was Bunker's assertion that she had worked as an assistant and technical specialist for the medical examiner's office from 1970 through 1982, when in reality she was a secretary at the medical examiner's office from 1970 to 1974, an assistant to the medical examiner from 1974 to 1981, and a technical specialist for the last five months of her employment with the medical examiner's office. In view of the fact that it is undisputed that she worked on thousands of cases while in the employ of the medical examiner, even this discrepancy becomes less serious.
However, assuming for the sake of argument that Bunker's testimony did contain serious discrepancies . . . we are convinced that these discrepancies did not have any impact on the outcome of the case in light of the overwhelming evidence presented at trial in support of Correll's guilt.
698 So.2d at 524. During Hannon's trial, Bunker made misrepresentations with regard to her credentials similar to those this Court addressed in Correll. Specifically, Bunker testified that from 1970 to 1982 she was employed by the Office of the District Nine Medical Examiner with jurisdiction in Orange, Osceola, and Seminole counties. She testified that as an assistant to the medical examiner one of her primary responsibilities was to assist the medical examiner in the medical/legal investigation of death. She also testified that she had presented courses on blood stain evidence and conducted workshops and lectured at various colleges and institutions. Similar to this Court's conclusion in Correll, any discrepancies in Bunker's testimony in the instant case did not "so affect[ ] the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932. Additionally, Bunker's testimony with regard to the blood spatters did not link Hannon to the crime scene. The dissent fails to address this area of concern, but is critical without substantive support. Accordingly, this claim is also without merit.[7]
Hannon further claims that the trial court erred in summarily denying the following claims with regard to Bunker: trial counsel was ineffective for failing to investigate Bunker's background, the State presented unreliable and nonscientific blood spatter testimony through Bunker, *1124 and the State's failure to disclose Bunker's qualifications and misrepresentations of Bunker's qualifications as an expert in the field of blood spatter constituted a Brady and Giglio violation. A criminal defendant alleging a Brady violation bears the burden to show prejudice, i.e., to show a reasonable probability that the undisclosed evidence would have produced a different verdict. See Strickler v. Greene, 527 U.S. 263, 281 n. 20, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To demonstrate prejudice under Giglio it must be established that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Hannon has failed to demonstrate prejudice relating to any aspect of Bunker's testimony sufficient to establish either a Brady or Giglio violation. Therefore, the trial court's rejection of these claims was not improper.

C. Failure to Question Michelle Helm
Hannon contends that his trial counsel was deficient in failing to question Michelle Helm, the former girlfriend of Ron Richardson, regarding her July 9, 1991, deposition testimony. Hannon asserts that Helm testified in her deposition that Richardson was a very jealous person who was violent and had threatened to kill her, often accusing her of sleeping with other men, especially Robbie Carter and Jim Acker. At the evidentiary hearing, trial counsel testified that he was present at Helm's deposition but was not concerned with this information to attack Richardson's testimony at trial because Richardson's specific bad acts were not only irrelevant to Hannon's alibi defense, such specific bad act evidence would not have been admissible at trial. Trial counsel testified that it was his strategy to lessen the focus on anything negative with regard to Richardson because it would be beneficial to Hannon's case with Richardson being Hannon's alibi witness until he altered his position at the end of the trial. Moreover, trial counsel's main focus when cross-examining Richardson after the change in testimony at the last moment was to show the jury that Richardson did not remember the details of the victims' apartment, and this negative information was not necessary to bolster the argument that Richardson's story was fabricated.
Based on the foregoing, Hannon has not demonstrated that trial counsel acted deficiently when he made the strategic decisions with regard to the interrogation of Helm concerning her deposition testimony and chose not to use her to attack Richardson. Hannon was not prejudiced by these decisions and accordingly, this claim has no merit.

II. Ineffective Assistance of Counsel at the Penalty Phase
To succeed in an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Pursuant to Strickland, trial counsel has an obligation to conduct a reasonable investigation into mitigation. See id. at 691, 104 S.Ct. 2052; see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Counsel's decision to not present mitigation evidence may be a tactical decision properly within counsel's discretion. See Brown v. State, 439 So.2d 872, 875 (Fla.1983) ("The choice by counsel to present or not present evidence in mitigation is a tactical decision properly within counsel's discretion."); Valle v. State, 705 So.2d 1331, 1335 n. 4 (Fla.1997) (same); Gorham v. State, 521 So.2d 1067, 1070 (Fla.1988) (same). When evaluating claims that counsel was ineffective for failing to investigate or present mitigating *1125 evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding." Asay v. State, 769 So.2d 974, 985 (Fla. 2000) (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). Further, as the United States Supreme Court recently stated in Wiggins:
[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

. . . .
. . . . [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."
539 U.S. at 521-23, 123 S.Ct. 2527 (citations omitted) (fifth alteration in original) (first emphasis supplied) (quoting Strickland, 466 U.S. at 688-89, 691, 104 S.Ct. 2052).
Contrary to the critical dissenting view, the counsel provided was neither standardless nor empty. As evidence of trial counsel's deficiency, Hannon asserts that trial counsel advanced an invalid lingering doubt argument during the penalty phase, hopeful that the jury would believe Hannon did not have the type of character to be involved in these crimes, and that trial counsel failed to investigate and present mitigation during the penalty phase. Specifically, Hannon asserts that trial counsel was ineffective in pursuing the innocence/alibi defense even after Hannon's alibi, Richardson, had changed his testimony to assist the State at the end of the trial and the jury had found Hannon guilty.
The nature of our bifurcated system in Florida places an onerous burden on death penalty counsel to be informed when making strategic and tactical decisions throughout both the guilt and penalty phases. Such is neither standardless nor an empty promise. We require and encourage death penalty counsel to conduct reasonable investigations as are appropriate to ensure that he or she can properly counsel and inform a defendant with regard to the nature and extent of the mitigation that may be viable in the case. However, not every death penalty investigation will find mitigating evidence, and an investigation into mitigation will run the gamut from discovering latent superficial mental disabilities to very open and evident brain damage. In addition, Strickland does not require defense counsel to present mitigating evidence at sentencing in every case. See Wiggins, 539 U.S. at 533, 123 S.Ct. 2527. However, if defense counsel decides not to investigate mitigation, that "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Wiggins, 539 U.S. at 521-22, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052); see also Rose v. State, 675 So.2d 567, 572 (Fla.1996) (stating that in evaluating the competence of counsel "the actual performance of counsel in preparation for and *1126 during the penalty phase proceedings, as well as the reasons advanced therefor," must be considered).
Investigating and presenting mental health mitigation is not always but certainly at times may be inconsistent with presenting an innocence defense during the penalty phase. However, failing to investigate and present mental health mitigation is not the sine qua non of ineffective assistance of counsel. We therefore must determine whether trial counsel's particular decision in this case not to investigate and develop mitigation was reasonable under the circumstances. See Wiggins, 539 U.S. at 521-22, 123 S.Ct. 2527. Based on the record in this case, Hannon has not and cannot demonstrate that his trial counsel was deficient during the penalty phase because, under these circumstances, Hannon's trial counsel at the time had specific tactical and calculated reasons for the strategy adopted. Counsel did not default in his obligation, as characterized by the dissent, but strategically adopted a different path. Further, the path taken was one with which Hannon agreed and which he fully supported.[8]
At the postconviction evidentiary hearing, trial counsel testified that Hannon, as well as Hannon's parents, adamantly maintained Hannon's innocence throughout the guilt and penalty phases. Trial counsel therefore decided to focus on obtaining an acquittal during the guilt phase, arguing that Hannon was totally innocent and not present at the crime scene, and then only if necessary proceed to establish during the penalty phase that Hannon did not have the type of character to commit such murders. Trial counsel testified that Hannon assisted in every aspect of his defense,[9] including testifying in his own defense during the guilt phase, and agreed to continue with the presentation of the innocence *1127 theme defense during the penalty phase, even after he was convicted. Trial counsel stated that he explained mitigation to Hannon and advised Hannon that he could change his position and admit his involvement in the murders during the penalty phase, but Hannon said he did not wish to do so. Cf. Cummings-El v. State, 863 So.2d 246, 252 (Fla.2003) (concluding that counsel was not ineffective in limiting mitigation investigation where defendant was adamant about not wanting his family to "beg for his life," and the defendant understood the nature and consequences of his decision not to present mitigating evidence).[10]
Trial counsel further testified that he had discussions with Hannon's parents and his sister Moreen, and he sought their input with regard to Hannon's defense. According to counsel, Hannon's parents and Moreen also agreed with a penalty phase strategy of character and to continue maintaining Hannon's innocence. Trial counsel stated that Hannon's parents "continued to believe their son did not and could not do this." Therefore, the dissent's assertion that counsel "blindly follow[ed] his client's desire to limit mitigation," see dissenting op. at 1161, is unsupported by the postconviction record. Rather, counsel's adoption of a strategy that focused on Hannon's character was the product of discussions with not only Hannon, but with his most intimate family members. According to counsel, Hannon and his family agreed not to pursue a strategy where, after proceeding during the guilt phase on the theory that Hannon was not present at the time of the murders, Hannon at the penalty phase would suddenly admit he committed the crimes and begin offering evidence in mitigation of the murders. Counsel stated that he, Hannon, and his family "decided that [changing tactics] wasn't what it was going to be because Mr. Hannon was adamant. I can't tell you how much he was adamant he wasn't there." Neither Hannon nor any of his family members suggested any mitigation matters for the penalty phase. Rather, Hannon, his parents, and his sister consistently urged the strategy that counsel ultimately adopted and pursued; that is, "keep[ing] a consistent defense and a consistent position."
Trial counsel further testified that he was fully aware that lingering doubt was not a statutory mitigator. However, trial counsel stated that providing evidence during the penalty phase that Hannon did not have the type of character to commit the murders, and continuing to support the underlying innocence defense, had a real and practical jury effect that would mitigate in favor of the jury sparing Hannon's life.[11] It was the character and demeanor of Hannon that trial counsel advanced in a very practical way. Even an expert in capital cases presented by Hannon during the postconviction evidentiary hearing admitted that the consistent approach had a *1128 practical and real impact factor in the juror's vote in terms of whether to vote for life imprisonment, notwithstanding that lingering doubt is not a recognized and valid statutory mitigating factor.
The record supports trial counsel's postconviction testimony that a defense based on the notions that Hannon did not commit the murders and was not even the type of person who could have committed the murders was developed from the beginning of trial. Even during the guilt phase, trial counsel presented Rusty Horn and Paul Kilgore to show that Hannon did not have the type of character to commit the murders and moved all of their guilt phase testimony into evidence during the penalty phase. Horn, Hannon's roommate and supervisor at his stucco job, described Hannon as a "teddy bear" type who had a reputation for nonviolence. Kilgore, another of Hannon's roommates, testified that Hannon was a nice person. Trial counsel decided it was not necessary, and likely would not have made any difference, to recall Horn and Kilgore during the penalty phase to reiterate that to which they had already testified. The record also demonstrates that trial counsel presented mitigation during the guilt phase through Hannon, who testified that he attended high school through the eleventh grade; wanted to work, earn money, and learn a trade; was a hard worker; obtained a job with Rusty Horn where he received an extra fifty cents an hour if he did not drink; worked at a gas station; delivered auto parts and pizza; and visited his sister's house on Christmas and celebrated with his nieces and nephews.
Trial counsel presented further evidence that Hannon did not have the type of character to commit these murders through the penalty phase testimony of Toni Acker and Hannon's mother and father. Acker testified that Hannon was "a good-time guy, carefree, liked to have fun"; that Hannon had cared for her child; and that Hannon was incapable of conduct such as these murders. Hannon's mother testified that Hannon had never hurt anyone in his entire life and that Hannon could not hurt any animal or person. Hannon's mother also pleaded with the jury, "Please, you've taken away his freedom for something he didn't do. Don't take away his life. Give us a chance, please, to prove that he never did anything like this. He couldn't." Hannon's father testified that Hannon had never been a violent person, and that he was always a "teddy bear." Hannon's father also testified that "[Hannon] says he's innocent. I believe he's innocent, and I think he ought to be given a chance to prove that he is innocent. That's it." The record supports trial counsel's postconviction evidentiary hearing testimony that his penalty phase strategy was to establish that Hannon did not have the type of character to commit the murders.
Contrary to the dissent's misdirected charge, we have not failed to recognize our legal precedent with regard to "lingering doubt" and have expressly factored that consideration into our decision today. This Court has repeatedly observed that residual doubt is not legally appropriate as a mitigating circumstance, see, e.g., Darling v. State, 808 So.2d 145, 162 (Fla.2002), and has consistently concluded that it is not error to deny an instruction that would allow a jury to consider lingering doubt or exclude evidence of lingering doubt during the penalty phase. See Duest v. State, 855 So.2d 33, 40 (Fla.2003) (concluding that the trial court did not err in denying an instruction that the jury could consider lingering doubt in rendering its advisory sentence).
Although this Court has previously rejected an argument that trial counsel was *1129 ineffective in the penalty phase for failing to argue lingering doubt as a mitigating circumstance, see Trepal v. State, 846 So.2d 405, 434 (Fla.2003), it has never expressly determined that trial counsel is per se ineffective for pursuing the practical impact that character evidence may create jury doubt and the impact it may have during the penalty phase. But see Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 787 (11th Cir.2003) ("Parker's attorneys were not deficient in focusing their time and energy on acquittal at trial and focusing their arguments at sentencing on residual doubt instead of other forms of mitigation." (parentheses omitted)). Further, contrary to the dissent's claim that we are ignoring United States Supreme Court case law, see dissenting op. at 1157, that Court has never resolved the issue advanced by the dissent either, not even in its most recent decision touching upon lingering doubt. See Oregon v. Guzek, ___ U.S. ___, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006).[12] However, trial counsel's strategy in the instant case of presenting evidence to demonstrate that Hannon did not have the type of character to commit the murders was a tactical method used by trial counsel in an attempt to sway the jury's recommendation in favor of life over death. See Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (concluding that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character that the defendant proffers as a basis for a sentence less than death).[13] It is certainly logical that a jury *1130 of laypersons is less likely to recommend death if they have some lingering concerns about guilt than if there is absolute certainty on the issue of guilt. See Lockhart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("[J]urors who decide both guilt and penalty are likely to form residual doubts or `whimsical' doubts . . . about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases.") (quoting Grigsby v. Mabry, 758 F.2d 226, 247-48 (8th Cir. 1985) (Gibson, J., dissenting)); Parker, 331 F.3d at 787-88 ("Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing.") (internal quotation marks omitted). The dissent refuses to even consider that lawless conduct related to illegal drugs or alcohol at times may even itself operate to be aggravating in the eyes of a lay jury rather than mitigating, as the dissent portrays those factors present. See generally Cummings-El, 863 So.2d at 267 ("Counsel acknowledged that drug abuse can have a double-edged sword effect on the jury, as juries are not sympathetic to junkies generally.") (quoted from trial court's denial order attached to opinion).
The conduct of Hannon's trial counsel does not constitute per se ineffective assistance of counsel. In Haliburton v. Singletary, 691 So.2d 466 (Fla.1997), this Court determined that conduct similar to that of Hannon's counsel did not constitute ineffective assistance. See id. at 471. At the evidentiary hearing in Haliburton, trial counsel testified that, although he was aware that Haliburton had suffered physical and sexual abuse as a child and that he had a history of substance abuse, and that these factors would be considered mitigating in many cases, they were more harmful than helpful in the case. See id. This information would have been more mitigating than any factor in the present case. Trial counsel in Haliburton testified that he elected not to call the mental health expert, even though she could have testified that there was a strong indication of brain damage, because she would have also testified that Haliburton was an extremely dangerous person and that he was likely to kill again. See id. According to trial counsel, testimony that Haliburton's emotional problems and deprived upbringing caused him to commit the crime or lessened his culpability would have conflicted with the picture of charity and pacifism painted by the other defense witnesses and would have been inconsistent with Haliburton's strategy. See id. The testimony that the defense witnesses offered in Haliburton is similar to the character evidence presented by trial counsel in the instant case. Trial counsel's penalty phase strategy was to humanize Haliburton by dwelling upon his close family ties and on the positive influence he had on his family and fellow inmates. See id. This Court held that "[e]ven though this strategy was unsuccessful in persuading the court and jury to sentence Haliburton to life imprisonment, we cannot conclude that he was ineffective. In light of the substantial, compelling aggravation found by the trial court, there is no reasonable probability that had the mental health expert testified, the outcome would have been different." Id.; see also Henry v. State, 862 So.2d 679, 686 (Fla.2003) (determining there was no deficient performance in counsel's decision to humanize defendant rather than use mental health testimony); Shere v. State, *1131 742 So.2d 215, 223-24 (Fla.1999) (determining that counsel was not ineffective for failing to request a neuro-psychological or neurological exam by a qualified expert even though trial counsel had obtained evidence of defendant's "severe head injury as a youth and his subsequent headaches" where counsel's penalty phase strategy was to portray the defendant as "a kind, gentle, God-fearing man"); Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (determining there was no error where retrial counsel was aware of mental mitigation "but made a strategic decision under the circumstances . . . to instead focus on the `humanization' of Rutherford through lay testimony"); Bryan v. Dugger, 641 So.2d 61, 64 (Fla.1994) (determining that trial counsel was not ineffective for choosing a mitigation strategy of humanizing the defendant and not calling a mental health expert).
Similar to trial counsel's evidentiary hearing testimony in Haliburton, trial counsel in this case testified that his primary goal was to convince the jury that Hannon was not at the crime scene and that he was not the type of person to commit these murders, and that counsel intentionally sought to avoid contradicting that defense by presenting witnesses to testify that Hannon had used illegal drugs, was unstable, failed at school, or was abused.[14] Trial counsel's strategy in this case from the beginning of trial and through the penalty phase was to emphasize Hannon's good character traits. According to trial counsel, attempting to present testimony that Hannon may have had drug and alcohol problems that may have influenced him to commit the murders, or hiring a mental health expert attempting to discuss possible mental health mitigation to lessen his culpability would have been in total conflict with the picture of the nonviolent, "teddy bear" image of Hannon and would have been inconsistent with his innocence/alibi defense. Even though ultimately this strategy was unsuccessful in convincing the court and the jury to sentence Hannon to life imprisonment, we conclude, as in Haliburton, that trial counsel was not ineffective in this case. The dynamics of a jury and a jury trial may often place practical considerations of human nature and citizen interaction on a level that cannot be simply ignored notwithstanding guiding statutory considerations when issues of life or death are involved.
An analogy can also be drawn to Straight v. Wainwright, 422 So.2d 827 (Fla.1982), a case in which the defendant challenged his trial counsel's failure to investigate for the purpose of developing evidence of mitigating circumstances. See id. at 832. There, trial counsel, as did trial counsel in this case, stated that he did not present mitigating circumstances because he felt them to be, even after the verdict of *1132 guilt, fundamentally inconsistent with the entire defense. See id. This Court concluded that trial counsel's performance was not ineffective where trial counsel viewed evidence of mitigating circumstances as fundamentally damaging to the integrity of his client's case. See id. Similar to trial counsel in Straight, Hannon's counsel here believed that any evidence of mitigating circumstances available would only damage the integrity of Hannon's case. Further, Hannon agreed with counsel in this case that mitigation evidence should not be presented during the penalty phase. Under the totality of the circumstances at the time of trial, counsel was not deficient in strategically choosing not to present mitigation evidence that would be in conflict with and contradict Hannon's innocence/alibi defense. See Parker, 331 F.3d at 788 (counsel not ineffective for failing to introduce evidence of mental defects and personality disorder where counsel did not see any signs of brain damage or mental disorder, and counsel further thought such evidence would be inconsistent with the defendant's alibi defense and would undermine defendant's credibility); Cummings-El, 863 So.2d at 252 (determining that counsel's performance was not deficient where penalty phase strategy was to present defendant in a positive light and not to present evidence of defendant's drug use, poor upbringing, and family members' criminal backgrounds; counsel believed that such evidence would have an adverse effect on the jury and, further, introducing any evidence of mental illness would have been inconsistent with the aforementioned strategy); Brown v. State, 439 So.2d 872, 875 (Fla.1983) (concluding that under the totality of the circumstances at the time of trial, counsel was reasonably effective where he testified that in his opinion presentation of mitigation evidence during the penalty phase was contradictory to the alibi defense and the defendant did not assist in pursuing mitigating evidence).
Neither the United States Supreme Court's decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), nor its recent decision in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), compels a different conclusion. In Wiggins, the Court concluded that defense counsel's performance fell below an objective standard of reasonableness where counsel abandoned their investigation into mitigation even though their limited investigation revealed information that would have led a "reasonably competent attorney to investigate further." 539 U.S. at 527, 123 S.Ct. 2527. The Supreme Court noted that defense counsel's investigation included a review of reports which noted that Wiggins had spent most of his life in foster care and had displayed emotional difficulties while there and that Wiggins' mother was a chronic alcoholic who on at least one occasion left her children alone for days without food. See id. at 523, 525, 123 S.Ct. 2527. The Supreme Court concluded that a reasonable attorney would have realized the need to pursue these leads further, but defense counsel abandoned the investigation at this juncture. See id. at 527, 123 S.Ct. 2527.[15] The Supreme Court determined that counsel's failure to investigate further into Wiggins' background resulted from inattention rather than reasoned strategic judgment, in part because during opening statements, counsel informed the jurors, "You're going to hear that [Wiggins] has had a difficult life," but then failed to *1133 provide the jury with any details of Wiggins' life history. See id. at 526, 123 S.Ct. 2527. In holding that counsel's performance was deficient, the Supreme Court nonetheless noted that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," id. at 533, 123 S.Ct. 2527, and distinguished Wiggins' case from others where the High Court had concluded that limited investigations into mitigation were reasonable. See id. at 535, 123 S.Ct. 2527.
In the recently decided Rompilla, the Supreme Court concluded that the defense counsel's conduct in preparation for the sentencing phase fell below the level of reasonable performance that is required by Wiggins and Strickland where defense counsel failed to review a court file on the defendant's prior conviction. See 125 S.Ct. at 2463-64. The Court stressed that it was not creating a per se rule requiring defense counsel to "do a complete review of the file on any prior conviction." Id. at 2467. Rather, the High Court found that counsel's performance fell below a level of reasonable performance because
counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial.
Id. at 2464. The Supreme Court in its conclusion emphasized that "the prior conviction file was a public document, readily available for the asking at the very court-house where Rompilla was to be tried," yet "counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time," the day before the evidentiary sentencing phase began. Id. Although the facts of Rompilla led the Court to the conclusion that defense counsel's performance was unreasonable, the Court held that "[o]ther situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment." Id. at 2467.
A careful reading of the Supreme Court's decisions in Wiggins and Rompilla reveals that those decisions are inapplicable to the facts of the instant matter. Unlike Wiggins, in the instant case there were no reports containing evidence of Hannon's life history which should have prompted trial counsel to conduct a deeper investigation into Hannon's background. In fact, trial counsel testified that during the criminal proceedings neither Hannon, his father, his mother, nor his sister Moreen ever mentioned that Hannon might suffer from some form of brain injury, that Hannon was abused or neglected, or that he had a traumatic childhood or a substantial drug problem. According to counsel, when asked if Hannon had been born with any problems, Hannon's parents stated that they had "no problem with him." Moreover, unlike Rompilla, there is no indication here that the State planned to rely on particular material in aggravation that was not obtained and reviewed by trial counsel prior to the penalty phase trial. Finally, and most distinguishing, unlike the defendants in Wiggins and Rompilla, Hannon adamantly expressed his wish to proceed consistent with the innocence defense during the penalty phase. The dissent's assertion that we have "ignore[d] the mandate for defense counsel's duty to investigate," dissenting op. at 1157, *1134 does not accommodate these critical facts. Consistent with his client's wishes, trial counsel sought to demonstrate that Hannon did not have the type of character to commit the murders rather than offering evidence on Hannon's drug use, his mental fitness, or his family history. Therefore, unlike defense counsel's deficient performances in Wiggins and Rompilla, trial counsel's limited investigation into mitigation under the specific facts of the instant case, which was based on the express wishes of Hannon, was within the level of reasonable performance that is required by Strickland and Wiggins.
Hannon has also failed to demonstrate that he suffered prejudice. Contrary to the dissent's view that a per se rule of reversal is required, upon application of all applicable authorities, including Wiggins and Rompilla, relief is not available here. In assessing prejudice, we reweigh the evidence in aggravation against the totality of the mental health mitigation presented during the postconviction evidentiary hearing to determine if our confidence in the outcome of the penalty phase trial is undermined. See Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (stating that in assessing prejudice "it is important to focus on the nature of the mental mitigation" now presented); see also Wiggins, 539 U.S. at 534, 123 S.Ct. 2527 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."). We conclude that it does not. There is no reasonable probability that had any of the mental health experts who testified at the postconviction evidentiary hearing testified at the penalty phase, Hannon would have received a life sentence. Our confidence has not been undermined in this outcome or proceeding.
At the evidentiary hearing, Hannon presented the testimony of Drs. Barry Crown, Faye Sulton, and Jonathan Lipman. Dr. Crown, an expert in clinical and forensic psychology and neuropsychology as well as substance abuse, testified that he performed a neuropsychological evaluation of Hannon and had reviewed background materials, as well as a cognitive test that had already been performed by Dr. Sulton. Dr. Crown testified that Hannon scored within normal limits on most of the tests that were administered and opined that Hannon's overall cognitive processing was "squarely within the heartland of what we would consider to be a typical person," but he demonstrated some difficulty with rapidly retrieving stored information and applying it to a new situation. Dr. Crown also testified that Hannon may have had some brain damage but he could not state that the brain damage in any way affected Hannon's behavior on the date of the crime because Dr. Crown had not been asked to consider or determine that in his evaluation.
Dr. Sulton, an expert in clinical psychology, testified that Hannon's thinking was not disturbed, nor was he having hallucinations or so deeply depressed that his thinking would be distorted. She opined that Hannon did not have any obvious major mental illness and that his behavior did not make much sense in light of his normal intelligence. She also testified that by January of 1991, Hannon had experienced many failures personally and professionally, worked several jobs, had been unsuccessful in the military, used vast amounts of illegal substances over a long period of time, and that his ability to function on a day-to-day basis, reason, use good judgment, and logically and sequentially plan activities were all compromised. She also testified that she found only nonstatutory mitigation through her interviews with family members and Hannon. These included areas of general parental neglect, *1135 lack of structure, and lack of discipline and guidance in his early environment; a childhood history of illness that interfered with his school life at a crucial time; extreme dependence on other people to assist him in basic living skills; dependence on Ron Richardson for employment and drugs; substance abuse over many years; extraordinary impulsivity at times and great lack of concentration; and an inability to formulate goal-directed behavior and to live as an adult. Dr. Sulton further testified that Hannon's personality changes, impulsivity, irritability, difficulty with concentration, and paranoid thinking would have impacted his day-to-day life. Ultimately, Dr. Sulton testified that in her opinion Hannon was not incompetent to stand trial at any point, was not insane at the time of the incident, and was of average intelligence.[16] Dr. Sulton agreed with Dr. Crown's overall picture of Hannon's normalcy with only some areas of deficit.
Dr. Lipman, a neuropharmacologist, testified that Hannon's degree of intoxication at the time of the offenses would not suggest to him that Hannon was unable to remember what occurred or would have rendered him unable to know what he was doing at the time of the crime. Dr. Lipman, however, admitted that he probably underestimated Hannon's drug burden at the time of the offense because he was not aware that Hannon had used cocaine the night of the crimes. Dr. Lipman basically agreed with the State's expert's conclusions, which included a polysubstance abuse diagnosis.
The State's expert, Dr. Merin, an expert in the fields of neuropsychology and forensic psychology, testified that he reviewed Drs. Sulton and Crown's testing and administered the Wechsler Adult Intelligence Scale III test to Hannon. Dr. Merin testified that he agreed with Dr. Crown's conclusions with the exception of Dr. Crown's finding of prefrontal lobe impairment. Dr. Merin explained the discrepancy was based on Dr. Crown using a shorter version of the Category Test. Dr. Merin testified that when he did the longer version of the test, three years after Dr. Crown, there was no indication of any prefrontal lobe impairment. Dr. Merin testified that he did not find any significant brain injury. Dr. Merin also opined that because Hannon was heavily into drugs and alcohol, he probably had destroyed some neurons in his brain, but not to the extent that it interfered with his ability to reason, to make decisions on his own behalf, to maintain goal-directed behavior, or to think logically. Dr. Merin further testified that he found no indication of any thought disorder or suggestion of psychosis or brain-related problems.
The postconviction testimony presented failed to establish the existence of statutory mental health mitigation (and indeed underscored Hannon's average intelligence and ability to reason), no expert was able to identify any significant brain damage, and there was contrary evidence. Even Dr. Crown, who arguably provided the most favorable testimony for Hannon, could not translate any brain damage as having any conceptual or actual impact on Hannon's behavior, and there was no evidence to establish any nexus between Hannon's mental health and his behavior or as it related to the crimes. Therefore, portraying Hannon as a drugged-out individual who had been involved in prior bad acts would have been more harmful, especially considering that the mental health implications were so equivocal.
*1136 Moreover, contrary to the dissent's claim that an investigation by trial counsel would have revealed "voluminous evidence of mitigation," see dissenting op. at 1169, the mitigation provided by witnesses during the postconviction evidentiary hearing was not compelling.[17] Indeed, the dissent offers what is actually a very one-sided presentation of postconviction witness testimony which creates a distorted view of Hannon's home life in an effort to bolster its assertion that trial counsel was ineffective for failing to conduct further investigation into mitigation.[18] Further, *1137 in sentencing Hannon to death, the trial judge found substantial aggravation in this case. Specifically, the trial court found three aggravating circumstances applicable to both the murders of Snider and Carter(1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. See Hannon, 638 So.2d at 41. As to Carter, the trial court found the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. See id.[19] On direct appeal, we affirmed the court's findings of aggravation. See Hannon, 638 So.2d at 43.
With regard to the HAC aggravator, we have previously noted that it is one of the most serious aggravators set out in the statutory sentencing scheme, see Everett v. State, 893 So.2d 1278, 1288 (Fla.2004), cert. denied, 544 U.S. 987, 125 S.Ct. 1865, 161 L.Ed.2d 747 (2005), and a review of the trial record demonstrates that the murders of Snider and Carter were particularly cruel. Hannon grabbed Snider, who had been stabbed by Acker fourteen times, from behind and slit his throat with such force that it nearly severed his head. Prior to that, Snider's screams could be heard throughout the apartment complex. An individual who was outside the apartment heard Snider gurgling on his own blood. At one point during the attack, Snider called to his roommate, "Call 911my guts are hanging out." Upon hearing Snider's screams, Carter came downstairs and witnessed Snider's brutal stabbing. Carter pleaded with the attackers to spare his life, at one point saying to Acker, "[L]et me get out of here," and then retreated to a bedroom upstairs, hiding under a bed. Despite these pleas, Hannon went upstairs and proceeded to fire six shots into the huddled, defenseless Carter with a semiautomatic pistol. Hannon fired two shots into Carter at close range, and four shots with the pistol placed in contact with, or nearly up against, Carter's body. Despite the number of gunshot wounds, Carter did not die instantaneously. An officer who responded to the 911 call testified that when he arrived at the upstairs bedroom, Carter was still gasping for breathCarter stopped breathing only just before the paramedics reached the bedroom. Based on the brutal and disturbing nature of these murders, there is no reasonable possibility that Hannon would have received a life sentence. Therefore, Hannon has failed to demonstrate that if the mental health and lay witness testimony presented during the postconviction evidentiary testimony had been offered at trial "the result of the proceeding would have been different," Strickland, 466 U.S. at 694, 104 S.Ct. 2052, and we fundamentally disagree with the dissent's assertion to the contrary. *1138 See dissenting op. at 1168. Our confidence in the outcome of this case has not been undermined. See id. Accordingly, this claim is without merit.

III. Summary Denial of Several of Hannon's Postconviction Claims
Hannon challenges the trial court's summary denial of several claims, which he argues warranted an evidentiary hearing. In Freeman v. State, 761 So.2d 1055 (Fla. 2000), this Court provided the following standard for determining whether an evidentiary hearing is required in a postconviction proceeding:
[A] defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden. However, in cases where there has been no evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. We must examine each claim to determine if it is legally sufficient, and, if so, determine whether or not the claim is refuted by the record.
Id. at 1061 (citations omitted); see also State v. Williams, 797 So.2d 1235, 1237-38 (Fla.2001). Each of Hannon's claims must, therefore, be considered under application of these concepts.

A. Voluntary Intoxication Defense
Hannon claims that the trial court erred in summarily denying his claim that trial counsel was ineffective during the guilt phase for failing to present a voluntary intoxication defense. Generally, under the law applicable to these murders, when trial counsel makes a tactical decision not to pursue a voluntary intoxication defense, "a trial court's finding that such a decision was tactical usually is inappropriate without an evidentiary hearing." Williams, 797 So.2d at 1239 (quoting Kitchen v. State, 764 So.2d 868, 869 (Fla. 4th DCA 2000)). However, this Court has recognized that when it is so obvious from the face of the record that trial counsel's strategy not to present a voluntary intoxication defense is very clearly a tactical decision well within the discretion of counsel, no evidentiary hearing is necessary. See id.
In Williams, the defendant claimed that his trial counsel was ineffective for failing to present the voluntary intoxication defense at trial. See id. at 1238-39. The defendant in Williams testified during the trial that he did not commit the crime. See id. at 1239. This Court concluded that "counsel cannot be deemed ineffective for failing to pursue the voluntary intoxication defense as such a defense would have been inconsistent with Williams' theory of the case [that he did not commit the murder]." Id.; see also Brown v. State, 894 So.2d 137, 146 (Fla.2004) ("Failure to present an intoxication defense cannot constitute ineffective assistance of counsel when the defendant asserts his innocence."); Rivera v. State, 717 So.2d 477, 485 (Fla.1998) (concluding that guilt phase counsel was not ineffective in foregoing a voluntary intoxication defense strategy because, "since a voluntary intoxication defense is, in effect, an admission that you did the crime but lacked the specific intent to be held criminally responsible, Rivera's unwavering professions of innocence short-circuited any credible voluntary intoxication defense during the guilt phase") (footnote omitted).
*1139 Similar to the defendant in Williams, Hannon testified during the trial proceedings that he did not commit the crime. Had trial counsel presented an intoxication defense, it would have been totally inconsistent with Hannon's defense that he did not commit the murder. In accordance with our decision in Williams, we conclude that Hannon's trial counsel cannot be deemed ineffective for failing to pursue the voluntary intoxication defense because such a defense would have been inconsistent with Hannon's innocence theory. Trial counsel's strategy in this case amounted to a tactical decision well within his discretion that was so obvious from the record that no evidentiary hearing was necessary. Accordingly, the trial court's summary denial of this claim was proper.

B. Trial Counsel's Failure to Adequately Prepare for Trial
Hannon claims that the trial court erred in summarily denying his claim that trial counsel was ineffective in failing to adequately prepare for trial. Hannon's argument on this issue consists of a single paragraph in which he merely lists the following allegationscounsel's failure to obtain Hannon's "rap sheet," failure to review photographs before trial, failure to cross-examine and impeach state witnesses, and failure to adequately question jurors regarding their views on capital punishmentand then simply concludes that he was entitled to an evidentiary hearing. Hannon in effect has chosen to contest the trial court's summary denial of this claim by merely listing these allegations without any supportive argument or authority with regard to the manner in which trial counsel's conduct was deficient or the prejudice he sustained. This Court has previously determined that similar speculative, unsupported arguments of this type are improper and for which no relief is available. See Cooper v. State, 856 So.2d 969, 977 n. 7 (Fla.2003) (rejecting similar argument as insufficient for consideration); Sweet v. State, 810 So.2d 854, 870 (Fla.2002) ("[B]ecause on appeal Sweet simply recites these claims from his postconviction motion in a sentence or two, without elaboration or explanation, we conclude that these instances of alleged ineffectiveness are not preserved for appellate review."); see also Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues. . . ."). Therefore, we conclude that Hannon's unsupported claim is improper and deny relief on this claim.

C. Brady/Giglio claim
Hannon asserts that the trial court erred in denying his claim that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[20] by failing to disclose that Richardson's testimony was presented in exchange for lenient treatment. Hannon also claims that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[21] by presenting false *1140 testimony at trial that Richardson would spend time in prison for his role in the case when he did not, and by presenting Richardson's fabricated testimony with regard to what occurred on the night of the murders. Hannon has failed to establish either a Brady or Giglio violation because he has not demonstrated that the evidence was suppressed by the State or that the State presented false testimony.
The record reveals that on Friday, July 19, 1991, the trial court inquired of Richardson and his attorney, Mr. Sinardi, whether Richardson would testify in Hannon's case. Richardson stated to the court that he planned to invoke his Fifth Amendment right not to incriminate himself and would not voluntarily testify on Hannon's behalf. Later that same day, the trial court informed the State that Richardson's attorney had sent a message that the State should not rest its case until Sinardi had an opportunity to speak with the State. At that point, the State indicated that it had received information that Richardson might change his position and be a prosecution witness against Hannon. On Monday, July 22, 1991, the trial court and Hannon's trial counsel were apprised that Richardson had finally made an agreement with the State, and a copy of Richardson's statement was provided to Hannon's counsel. Subsequently, Richardson became a willing witness and answered questions with regard to the voluntariness of his statement. It was revealed at that time that Richardson had agreed to provide the voluntary sworn statement to the State based on the assumption that he would be adjudicated guilty of only accessory after the fact and be sentenced to five years in prison. During the State's direct examination of Richardson, he stated that he had the advice of his attorney, they approached the State, and an agreement had been entered. Richardson also testified that he intended to testify truthfully regardless of whether it was the State or the defense that called him as a witness.
There is no indication that the State suppressed evidence relating to its agreement with Richardson. The record reveals that Richardson approached the State to negotiate an agreement, the State came to an agreement with Richardson on a Sunday evening, and the next morning the State informed Hannon's trial counsel and the trial court of the plea agreement. The record facially reflects that Hannon's trial counsel knew of the agreement at the time of the trial, it was disclosed the following morning, and the existence of a Brady violation is conclusively refuted. See Tompkins v. State, 872 So.2d 230, 239 (Fla.2003) ("Because defense counsel knew of the report . . . a Brady violation is conclusively refuted."); see also Foster v. State, 810 So.2d 910, 916 (Fla.2002); Bryan v. State, 748 So.2d 1003, 1008 (Fla. 1999).
Hannon has not shown that the State presented false testimony at trial that Richardson would spend time in prison for his role in the case when he did not. In fact, with regard to the agreement, Hannon's trial counsel elicited from Richardson during cross-examination: that the previous morning (Sunday) Richardson was facing two possible death penalty convictions and by the previous (Sunday) evening he had received an agreement to limit a sentence to five years; and that Richardson's attorney had not advised Richardson of a specific release date from the sentence due to his gain time. Thus, the jury learned of the State's arrangement with Richardson and was able to judge the credibility of Richardson's testimony at trial. Based on the foregoing, the record *1141 facially supports the conclusion that the jury was in fact informed that with his gain time, Richardson might not actually spend five years in prison. Hannon has not shown that the State suppressed any evidence that Richardson might not serve time in jail after his gain time was calculated or that it misrepresented to the jury the length of time Richardson was expected to actually serve for his participation in the murders.
Hannon has also failed to demonstrate a Giglio violation with regard to Richardson's testimony relating to what occurred on the night of the murders. Hannon simply asserts that Richardson's testimony was fabricated without additional facts, or any facts that the State knew Richardson's testimony was false. Hannon has not provided a factual basis that the State instructed Richardson to lie with regard to what occurred on the night of the murders, or that Richardson did lie. Accordingly, the circuit court's denial of Hannon's Brady and Giglio claims was proper.

D. Conflict of Interest
Hannon asserts that the trial court erred in summarily denying his claim that trial counsel had an undisclosed conflict that prevented him from rendering effective assistance. Specifically, Hannon claims that because his trial counsel was endeavoring to also obtain codefendant Richardson as a client in connection with his representation of Hannon, trial counsel was blinded to pursuing avenues of investigation that may have pointed to Richardson's role in these killings. Further, Hannon alleges that this conflict clouded trial counsel's ability to effectively cross-examine Richardson. However, the facts that formed the basis for this alleged conflict of interest were known to Hannon at the time of his trial and, therefore, could have been and should have been presented on direct appeal. See Thompson v. State, 759 So.2d 650, 661 (Fla.2000) (concluding that the trial court correctly found that the defendant's conflict of interest postconviction claim was procedurally barred because the facts that formed the basis for this alleged conflict of interest were known to the defendant at the time of his direct appeal and thus should have been presented on direct appeal); Jackson v. Dugger, 633 So.2d 1051, 1055 (Fla.1993) (determining that the defendant's claim that trial counsel had a conflict of interest was procedurally barred in 3.850 motion). Therefore, the trial court's summary denial of this claim was proper.

E. State's Use of Jailhouse Informants
Hannon asserts that the trial court also erred in summarily denying his claim relating to the State's allegedly improper use of jailhouse informants. Specifically, Hannon claims that non-record evidence supports his assertion that Keith Fernandez had no information to provide when the State first contacted him but informed an officer that he could obtain more information from Hannon. Hannon further alleges that non-recorded information reveals that Fernandez's assistance in Hannon's case was considered when Fernandez was sentenced for his crime, notwithstanding Fernandez's testimony that he was not given anything in exchange for his testimony. Hannon also claims that his trial counsel was not aware that in exchange for Jonathon Ring's testimony against Hannon, State investigator Scott Hopkins wrote a letter on September 6, 1991, to the superintendent of the prison where Ring was housed requesting that gain time Ring lost while waiting to testify be reinstated. Hannon contends that to the extent trial counsel failed to discover *1142 this information, Hannon was denied the effective assistance of counsel, and to the extent the State failed to disclose this information, violations of Brady and Giglio occurred.
Hannon has failed to provide a factual basis that the State made undisclosed concessions or guarantees of favors to either Fernandez or Ring in return for information against Hannon, or that either Fernandez or Ring were agents of the State. Based on the record, the trial court properly found that Hannon was not entitled to relief and therefore, summary denial of postconviction relief was appropriate:
The letter written [by Scott Hopkins] on September 6, 1991, was written subsequent to July 23, 1991, the date the guilt phase of Defendant's trial ended. Therefore, the fact that Mr. Hopkins wrote this letter after the trial, does not prove that Mr. Ring was promised anything in exchange for his testimony in Defendant's case. As such, no relief is warranted with respect to this portion of claim VII.
. . . .
Third, Defendant claims Mr. Fernandez and other informants were acting as agents of the State and Defendant's right to counsel was violated. However, Mr. Fernandez testified that he was asked by a deputy or detective if he had any information, and he replied, "Yeah," but he was never offered anything for his cooperation in the case, nor was he aware that Mr. Hellickson and Mr. Lewis told his prosecutor that they had no objection to him being released from custody. (See Trial Transcript, Volume VII, pages 773-774, 776-779, attached). Moreover, during the deposition of Mr. Fernandez, Defendant's counsel was made aware that Mr. Fernandez and Defendant had talked about Defendant's case, but Mr. Fernandez never stated, either at the deposition or at trial, that Defendant confessed to him. (See Trial Transcript, Volume VII, pages 769-788, Deposition of Mr. Fernandez, attached). Therefore, Defendant has failed to prove that Mr. Fernandez and the other inmates who testified against Defendant were agents of the State. Since Defendant has failed to prove Mr. Fernandez and the other inmates were agents of the State, no relief is warranted with respect to this portion of claim VII.
Fourth, Defendant claims ineffective assistance of counsel to the extent that counsel failed to discover the aforementioned information. However, since Mr. Fernandez and the other inmates were not agents of the State, counsel was not ineffective for failing to raise non-meritorious issues. See Parker v. State, 611 So.2d 1224, 1227 (Fla.1993). Moreover, Defendant's counsel attempted to discredit the six informants of the State with testimony from several inmates that they never heard Defendant talk to anyone in the jail regarding his case. (See Trial Transcript, Volume XII, pages 1305-1316, 1333-1335, attached). As such, no relief is warranted with respect to this portion of claim VII. (PCR6/1134-1136)
See Gudinas v. State, 816 So.2d 1095, 1101 n. 6 (Fla.2002) (finding no error in trial court summarily denying legally sufficient claims where claims were conclusively refuted by trial record). Accordingly, this claim was properly denied by the trial court.

F. State's Use of Misleading and Improper Argument
Hannon claims that the State's case was permeated with improper innuendo and argument based on facts not in evidence and that were false. First, Hannon asserts that the following "slaughterhouse" *1143 arguments made by the State during the guilt phase closing argument were not supported by any factual basis:
If I had to think of a name for this case, something to summarize what this case is all about, the name I would choose would be "The Slaughterhouse. The Slaughterhouse." Because on January 10, 1991, a man sitting in this very courtroom, turned the home of Brandon Snider and Robbie Carter into a slaughterhouse.
. . . .
Hannon worked at a slaughterhouse. Hannon had access to knives. He had access to knives. He used knives in the past to kill. He testified on the stand that he killed before, killed animals before.
However, the record demonstrates that the State's "slaughterhouse" arguments were supported by the evidence. Specifically, John Ring testified at trial that Hannon stated the following:
[Hannon] said that the cops were trying to pin a murder on him, that they had they wanted to pin him because he had worked in a slaughterhouse and he was cutting throats for a living, because that made him a violent person, that they were trying to pin that on him and that he had shot this guy six times.
Moreover, at trial Hannon testified that he worked in a slaughterhouse in Okeechobee slaughtering cows, and in Brooksville slaughtering pigs and hogs. Hannon described that he would shock the animals, make an incision in them, and hang them upside down to bleed them. Hannon testified in detail with regard to what occurred on certain days at the slaughterhouse, including that Mondays and Wednesdays were slaughter days when they killed the hogs. Hannon described the different functions related to cutting, specifically that if you were right-handed you would have the knife in your right hand and grab the meat with your left hand. Hannon also testified that he had taken a pork loin to Robbie Carter's house, boned it out, and cut some pork chops. Hannon further testified that during the time January 14 through 16, he had attempted to secure work with Richardson at the slaughterhouse but could not because business was slow. Based upon our review of the record, we determine that there was testimony regarding Hannon's work in the slaughterhouse to support the State's analogy. Accordingly, the trial court's rejection of this claim was proper.
Additionally, Hannon asserts that trial counsel's failure to object to the following argument made by the State during closing argument was unreasonable: "[S]ometimes you need to make a deal with a sinner in order to get the devil. That's what we did in this case. Ron Richardson did wrong. He was a sinner. We dealt with him to get the devil." Irrespective of whether trial counsel was deficient, Hannon has failed to show prejudice. In Moore v. State, 820 So.2d 199 (Fla. 2002), Moore claimed that defense counsel was ineffective for failing to object to the following remarks made by the prosecutor during the State's guilt and penalty phase arguments:
Crime conceived in hell will not have any angels as witnesses. And, ladies and gentleman, as true as that statement is, Grand Park is hell. And that man right there is the devil. . . .
Ladies and gentlemen, deals. Yes, ma'am, yes, ma'am, yes, sir, to all of you. I have dealt with [co-defendant 1] and I have dealt with [co-defendant 2]. I did that as an Assistant State Attorney. I did that the best I knew how. But, ladies and gentlemen, sometimes you have to deal with sinners to get the devil. And I would submit to you what *1144 the State did was we dealt with this sinner and we dealt with this sinner to get this devil.

Id. at 207 (emphasis supplied). This Court concluded:
[T]he two isolated references to Moore as "the devil" in this instance, although ill advised, appear to be less problematic than the pervasive and extensive conduct condemned in Brooks [v. State, 762 So.2d 879 (Fla.2000),] and Urbin [v. State, 714 So.2d 411 (Fla.1998)]. Rather, this case appears to be more akin to Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla.1997), where this Court held that a prosecutor's isolated comments that defense counsel engaged in "cowardly" and "despicable" conduct and that the defendant was a "malevolent . . . a brutal rapist and conscienceless murderer" was not so prejudicial as to vitiate the entire trial.
Id. at 208. Similar to Moore, the State's comment during closing in the instant case that they made a deal with the sinner to get the devil was not so prejudicial as to undermine our confidence in the case. Accordingly, this claim is also without merit.

G. Constitutional Errors
The trial court summarily denied Hannon's claims that trial counsel was ineffective in failing to object to what he contends were constitutional errors. Hannon now asserts the following: (1) the burden of proof was improperly shifted to Hannon during the penalty phase; (2) Hannon's jury was repeatedly instructed by the court and the prosecutor that its role was advisory and simply a recommendation, diminishing the jury's sense of responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (3) instructing the jury that they could find as an aggravating circumstance the fact that Hannon was engaged in the commission of the crime of burglary based upon the State's alternative theory of felony murder rendered him automatically eligible for the death penalty. The trial court properly denied this claim because all of the individual assertions fail because they are procedurally barred or without legal merit. See Power v. State, 886 So.2d 952, 956 (Fla.2004); Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000); Blanco v. State, 706 So.2d 7, 11 (Fla.1997); Johnson v. State, 660 So.2d 637, 647-48 (Fla.1995). All of these claims were properly denied by the trial court.

H. Newly Discovered Evidence
To obtain postconviction relief based on newly discovered evidence, Hannon must demonstrate
first, that the newly discovered evidence was unknown to the defendant or defendant's counsel at the time of trial and could not have been discovered through due diligence and, second, that the evidence is of such a character that it would probably produce an acquittal on retrial.
Mills v. State, 786 So.2d 547, 549 (Fla. 2001). Hannon asserts that codefendant Jim Acker's subsequent life sentence constitutes newly discovered evidence and that, had trial counsel known what was revealed at Acker's trial, it is more than likely that trial counsel would have been able to prove that Hannon's role in the crime was that of the least culpable codefendant.[22] Hannon directs our attention to Scott v. Dugger, 604 So.2d 465 (Fla.1992), to support this claim. In Scott, this Court addressed whether "a codefendant's subsequent life sentence constitutes newly discovered evidence which would permit collateral *1145 relief." Id. at 468. This Court held that "in a death case involving equally culpable codefendants the death sentence of one codefendant is subject to collateral review under rule 3.850 when another codefendant subsequently receives a life sentence." Id. at 469.
Unlike Scott, which involved equally culpable codefendants, this Court on direct appeal determined Hannon to be the most culpable defendant in this case:
In the instant case, the record reflects that Hannon murdered both victims. Hannon delivered the fatal blow to Snider, slashing Snider's throat after Acker had stopped stabbing him. Also, it was Hannon who shot Carter. Clearly, Hannon is the most culpable of the three accomplices in this case, and the two death sentences are justified.
Hannon, 638 So.2d at 44. Contrary to Hannon's assertion, this Court's decision in Scott is not persuasive because the instant case does not involve equally culpable codefendants. Therefore, we conclude that the trial court properly denied this claim.
Next, Hannon alleges that the testimony of Kelly Reynolds, a niece of Ron and Mike Richardson, constitutes newly discovered evidence. Specifically, Hannon claims that testimony Reynolds presented at an evidentiary hearing for codefendant Jim Acker demonstrates that Richardson provided materially false information at Hannon's trial. The material included the following: that after Ron Richardson was released from jail he returned to Indiana and lived in the same house as Reynolds; that during that time, Ron Richardson discussed this case on more than one occasion, and Richardson admitted that Jim Acker was not present when the murders occurred; and that Reynolds overheard Ron Richardson on the phone with his brother Mike telling him to forget the money he owed Ron because Mike saved Ron from going to prison. Hannon has failed to show that Reynolds' testimony proves Ron Richardson's testimony at Hannon's trial with regard to the night of the murders was false. Reynolds' statements do not make any reference to Hannon or the testimony that Richardson provided at Hannon's trial. Thus, the alleged statements are not of such nature that they would probably produce an acquittal on retrial. See Mills, 786 So.2d at 549. Accordingly, this claim is without merit.
Hannon next asserts that FBI Special Agent Michael Malone provided unreliable and false testimony during trial. Hannon further claims that the State withheld an FBI Crime Laboratory investigation by the U.S. Department of Justice, wherein Malone was criticized for conducting incomplete tests and exaggerating testimony to fit the government's case, and the report recommended that Malone be subject to disciplinary action. The record indicates that Malone testified during the trial here that there "were no hairs like Mr. Hannon anywhere in the residence or on the victims." Malone testified that he compared a fabric impression made on a door with a pair of Hannon's trousers, which were taken from Hannon when he was arrested, and that Hannon's pants did not match the impression on the victims' door. Malone further testified that the particular pattern of the impression made on the door was consistent with the type that would be made by an item such as a blue jean fabric. However, Malone did not testify that Hannon was wearing a blue jean fabric or that he tested any blue jean fabric belonging to Hannon.
Hannon has not presented any facts to show that Malone's testimony was unreliable or false. Moreover, Hannon was not prejudiced by Malone's testimony because his testimonythat hair and fiber collected at the scene did not match Hannon's, *1146 and that Hannon's pants did not match the fabric impression made on the victim's doorwas not damaging to Hannon. Hannon, however, claims that Malone's testimony was significant because of its implication that Hannon was in the victims' apartment the night of the murders, but failed to leave any hairs as evidence. Hannon highlights that the State during its closing argument emphasized Malone's testimony that the fiber impression on the outside of the victims' front door was consistent with a blue jean type material, and that all the witnesses identified the three who left the victims' apartment as wearing blue jeans. The State further argued during closing that Richardson identified Hannon as wearing blue jeans on the night of the crimes. Notwithstanding these arguments, it is not likely that had trial counsel had the FBI report relating to Malone, trial counsel would have used it to challenge Malone's expertise or testimony. During the postconviction evidentiary hearing, trial counsel testified that in his view Malone had in fact helped or advanced Hannon's alibi defense. Therefore, it is not likely that evidence that Malone was investigated would have been presented even if it was available. Moreover, even if the jury had heard the information found in the FBI report, it is not of such a character that it would probably produce an acquittal on retrial. See Mills, 786 So.2d at 549. There is no merit to this claim and it is also denied.

IV. Avoiding Arrest Aggravator
Hannon claims that the instruction given on the committed-to-avoid-arrest aggravating factor is unconstitutionally vague and was improperly applied in his case. This claim is procedurally barred because it could have been, and should have been, presented on direct appeal. See Lopez v. Singletary, 634 So.2d 1054, 1056 (Fla.1993) (concluding that challenge to the avoid arrest aggravator was procedurally barred in postconviction proceedings because it could have been presented on direct appeal). Procedural bar notwithstanding, this claim is meritless because this Court has previously upheld the constitutionality of the standard jury instruction for the avoid arrest aggravator. See Griffin v. State, 866 So.2d 1, 16 (Fla.2003); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla. 2002); see also Whitton v. State, 649 So.2d 861, 867 n. 10 (Fla.1994) (concluding that the standard jury instruction for avoid arrest aggravator is not unconstitutionally vague and did not require a limiting instruction to make this aggravator constitutionally sound). Therefore, this claim is denied.
Hannon also alleges that there was insufficient evidence to support the application of the avoid arrest aggravator. This claim was rejected by this Court on direct appeal:
Hannon next argues that the evidence did not support the aggravating circumstance that the murder of Carter was committed for the purpose of avoiding or preventing lawful arrest. When a murder victim is not a law enforcement officer, "[p]roof of the requisite intent to avoid arrest and detection must be very strong." Riley v. State, 366 So.2d 19, 22 (Fla.1978). In the instant case, the record reflects that Hannon, Acker, and Richardson went to the home of Snider and Carter to kill Snider. The motive was the conflict between Snider and Jim Acker's sister. Carter was not a party to this conflict. Carter, however, lived with Snider, and witnessed Snider's murder. Carter knew, and could identify, Hannon and the others. After his arrest and incarceration, Hannon told a cellmate that one of the victims was a "real jerk," but that the other was a "pretty nice guy" who was just in the wrong place at the wrong time. In the *1147 course of discussing another cellmate's crime, Hannon told him that he should not have left any witnesses. Clearly, the murder of Carter was ancillary to the primary purpose of obtaining revenge against Brandon Snider. See Troedel v. State, 462 So.2d 392, 398 (Fla. 1984). The finding that Carter was murdered for the purpose of avoiding or preventing lawful arrest is fully supported by the record.
Hannon, 638 So.2d at 43-44. Accordingly, this claim also has no merit.

V. Applicability of Heinous, Atrocious, or Cruel Aggravator
Hannon asserts that the facts of the instant case do not support the finding of heinous, atrocious, or cruel. On direct appeal, this Court rejected this claim. See Hannon, 638 So.2d at 43. Accordingly, we hold that this claim is procedurally barred because it was addressed and denied on direct appeal.

VI. Innocent of the Death Penalty Claim
To prevail on a claim of being innocent of, or ineligible for, the death sentence received, Hannon must demonstrate constitutional error invalidating all of the aggravating circumstances upon which the sentence was based. See Vining v. State, 827 So.2d 201, 216 (Fla.2002). Hannon has not made such a showing here. Hannon's contention regarding the sufficiency of aggravation was decided adversely to Hannon on direct appeal and is not cognizable de novo in this postconviction proceeding. Specifically, this Court on direct appeal concluded that the facts of Hannon's case supported the finding of HAC and the prior violent felony aggravator with regard to both victims, and that the murder of Carter was committed for the purpose of preventing lawful arrest. See Hannon, 638 So.2d at 43-44. This Court determined that Hannon's two sentences of death were proportionate and affirmed the convictions and sentences. See id. at 44. Accordingly, Hannon's "innocent of the death penalty" claim has no merit. See Sochor v. State, 883 So.2d 766, 788 (Fla.2004) (rejecting the defendant's "innocent of the death penalty" claim because the Court determined on direct appeal that the evidence supported the existence of three aggravating circumstances).

VII. Constitutionality of Florida Capital Sentencing Statute
Hannon asserts that Florida's capital sentencing scheme is unconstitutional under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. See also Jones v. State, 845 So.2d 55, 74 (Fla.2003). Hannon is likewise not entitled to relief on this claim. Furthermore, one of the aggravating circumstances found by the trial court in this case was Hannon's prior conviction of a violent felony, "a factor which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla. 2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003); Johnson v. State, 904 So.2d 400 (Fla.2005) (holding that Ring does not apply retroactively). Accordingly, this claim is also rejected.

*1148 VIII. Cumulative Error
Hannon's claim of cumulative error is without merit. As all of Hannon's individual claims are either procedurally barred or without merit, his cumulative error claim must fail. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."); Vining v. State, 827 So.2d 201, 219 (Fla.2002) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit."); see also Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). Therefore, this claim is also rejected.

PETITION FOR WRIT OF HABEAS CORPUS
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine:
[W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000); Thompson, 759 So.2d at 660. "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford, 774 So.2d at 643 (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)). It is under this legal framework that Hannon's habeas claims will be addressed.

I. Fundamental Error
Hannon asserts that he is entitled to a new trial due to fundamental error because he was convicted of a crime not charged in the indictment. The grand jury indicted Hannon, charging him with two counts of murder from a premeditated design for the deaths of Brandon Snider and Robert Carter. The indictment did not charge Hannon with felony murder, burglary, or any other felony. The trial judge in the instant case instructed the jury on first-degree premeditated murder and first-degree felony murder and defined the crime of burglary. The jury returned a general verdict finding Hannon guilty of first-degree murder. Hannon argues that reversal of his conviction is warranted because the jury just as likely found Hannon guilty of felony murder, which he was not charged with, as premeditated murder.
We have repeatedly held that there is no error in permitting the State to proceed on a theory of felony murder when the indictment charges the defendant with first-degree premeditated murder. See Anderson *1149 v. State, 841 So.2d 390, 404 (Fla.2003) (rejecting the defendant's argument that the trial court erred in permitting the State to proceed on the theory of felony murder when the indictment only charged first-degree murder); Kearse v. State, 662 So.2d 677, 682 (Fla.1995) ("The State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder."); Knight v. State, 338 So.2d 201, 204 (Fla.1976) ("We find appellant's allegation that the court erred in allowing the State to prosecute the charges [sic] under a theory of felony murder when the indictment charged premeditated murder to be absolutely contrary to established precedent."). Therefore, we conclude that appellate counsel was not ineffective for failing to present this meritless issue on appeal. See Rutherford, 774 So.2d at 643.
Hannon further alleges that he is entitled to relief pursuant to this Court's decision in Delgado v. State, 776 So.2d 233 (Fla.2000), where this Court held that the phrase "remaining in," which is found in the burglary statute, was limited to situations where the "remaining in" was done surreptitiously. See id. at 240. However, the Delgado Court specifically stated that its "opinion will not, however, apply retroactively to convictions that have become final." Id. at 241. Hannon's convictions and sentences were affirmed on direct appeal on June 2, 1994, and therefore had become final prior to the release of Delgado. See Jimenez v. State, 810 So.2d 511, 512 (Fla.2001) (determining Delgado is not subject to retroactive application and that Jimenez was not entitled to relief pursuant to Delgado since Jimenez's convictions were final prior to the release of Delgado). Accordingly, Hannon is not entitled to relief pursuant to Delgado.
Hannon asserts that this Court recently confronted a similar question in Fitzpatrick v. State, 859 So.2d 486 (Fla.2003); however, Hannon's reliance on Fitzpatrick is misplaced. In Fitzpatrick, this Court invoked the principle that "a general verdict is invalid when it rests on multiple bases, one of which is legally inadequate," and reversed for a new trial because the jury had been given an erroneous burglary instruction. Id. at 490 (emphasis added) (citing Yates v. United States, 354 U.S. 298, 312-13, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)). Since Fitzpatrick's conviction had not become final at the time Delgado was released, Delgado was applicable to Fitzpatrick, and thus the general verdict in his case was invalid because it rested on multiple bases, one of which at the time of Fitzpatrick's direct appeal was inadequate due to Delgado's applicability. Hannon's claim is different from Fitzpatrick because, as previously explained above, Delgado is not applicable to Hannon's case.
Finally, Hannon claims that his appellate counsel was ineffective for failing to present on direct appeal that Hannon was convicted of a crime for which he was not charged in the indictment. This Court rejected this claim in Freeman v. State, 761 So.2d 1055, 1071 (Fla.2000) (rejecting Freeman's claim that "appellate counsel was ineffective for failing to argue that the trial court erred in denying the pretrial motion to dismiss the indictment because it did not specifically charge felony murder"); see also Gudinas v. State, 693 So.2d 953, 964 (Fla.1997) ("We have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory."). Thus, we conclude that appellate counsel was not ineffective for failing to present this meritless issue on appeal. See Rutherford, 774 So.2d at 643.

*1150 II. Constitutionality of Florida's Capital Sentencing Statute
In his petition for writ of habeas corpus, Hannon argues that under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Florida's death penalty scheme is unconstitutional and that the Ring decision applies retroactively to him. We have previously rejected each of the claims Hannon presents in his habeas petition. See Johnson v. State, 904 So.2d 400 (Fla.2005) (holding that Ring does not apply retroactively); Monlyn v. State, 894 So.2d 832, 839 (Fla.2004) (concluding that the defendant lacked standing to assert any error with regard to lack of jury unanimity because the jury returned a unanimous recommendation of death); Duest v. State, 855 So.2d 33, 48-49 (Fla.2003) (rejecting a claim that the jury must unanimously specify each aggravator found), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004); Doorbal v. State, 837 So.2d 940, 963 (Fla.) (stating that the prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Finally, we deny Hannon's habeas claim that he is entitled to relief based on a hybrid claim under Ring and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), as we did in Robinson v. State, 865 So.2d 1259, 1266 (Fla.2004). Accordingly, we deny habeas relief on this claim.

CONCLUSION
For the foregoing reasons, we affirm the trial court's denial of Hannon's rule 3.850 motion and deny Hannon's petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., concurs.
QUINCE, J., recused.
ANSTEAD, J., Dissenting.
The United States Supreme Court and this Court have repeatedly emphasized that counsel in death penalty cases must investigate first and then develop strategy that is informed by actual knowledge. See, e.g., Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir.1991) ("The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsel's eagerness to latch onto Blanco's statements that he did not want any witnesses called."). The point is that one cannot develop strategy in a vacuum. In fact, Hannon's counsel repeatedly conceded that he failed to investigate Hannon's background because he had decided on a continuing not guilty strategy before doing a proper investigation. In accordance with the United States Supreme Court's and this Court's controlling decisions regarding ineffectiveness of counsel, I would remand this case for a new penalty phase with new and competent counsel.
I cannot concur in the majority's determination that Hannon's counsel was not ineffective in failing to pursue any investigation into mitigating circumstances for the penalty phase of the trial and, instead, even in the face of a unanimous jury determination of guilt, continuing to express his disagreement with the jury's verdict.[23] Instead *1151 of honoring his obligation to investigate and present a case for mitigation to the jury in accord with Florida law, counsel continued to challenge the jury's verdict. Moreover, Hannon's counsel testified at the postconviction hearing that he failed to investigate Hannon's background because he irrationally "expected this case to go back to trial. [He] expected that someone could come forward or there'd be a *1152 confession in jail just like you read about all the time. It happens all the time. [He] said this is going to happen in this case and [they've] preserved his ability to go to trial again." Hannon's counsel was also convinced "that perhaps with the passage of time Ron Richardson would come in and change his story . . . [e]specially knowing the guys up there are going to get killed for this." Such naiveté would be surprising anywhere, but it is shocking and inexcusable on the part of a lawyer charged with defending a capital offense. It is not surprising however, that such a tactic was rejected by the jury by a unanimous vote recommending the imposition of the death penalty.

RIGHT TO THE ASSISTANCE OF COMPETENT COUNSEL
As the majority notes, "[a]n ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Unfortunately, since the United States Supreme Court first recognized that the United States Constitution not only provided a right to counsel for indigent criminal defendants but also a right to "competent" counsel, this recognition has been honored all too often in its breach. The case before us today presents a classic example of legal incompetency where it hurts the mostby counsel's blatant failure to investigate or present a case for life for a defendant already found guilty of capital first-degree murder. The majority essentially treats the guarantee of competent counsel articulated in Strickland as a standardless empty promise, based upon a lowest common denominator assessment under which any performance by a licensed attorney meets the constitutional guarantee.
I cannot agree that the Supreme Court has failed to provide meaningful standards to this most sensitive category of cases, those involving the death penalty, especially in its most recent decisions. See Wiggins, 539 U.S. 510, 123 S.Ct. 2527; Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In Strickland the Supreme Court stressed that because we have an adversarial system of justice which relies heavily on the competence of counsel to ensure a just result, capital defendants are entitled to genuine adversarial testing at both the guilt and penalty phases of a capital trial.
In this case there was no adversarial testing in the penalty phase, and, consequently, there was no justice. After the State presented its case for the death penalty in the penalty phase, the jury essentially turned to defense counsel to ask why it should not accept the prosecution's case for the death penalty. At this critical juncture, with his client's life on the line, instead of presenting evidence and arguments as to why the death penalty was not appropriate, defense counsel essentially defaulted. His only defense was that his client was not really guilty. However, the jury had already decided this issue against the defense, and the jury was left with no choice but to again unanimously reject this innocence defense and accept the State's argument that the death penalty was the appropriate punishment. That is why this case constitutes a classic case of ineffectiveness of counsel. There was absolutely no adversarial testing of the appropriateness of the death penalty in this case.
I. Deficient Performance
The majority makes no serious effort to distinguish Wiggins and the other United *1153 States Supreme Court decisions both emphasizing defense counsel's fundamental duty to investigate and rejecting the use of a continuing innocence defense at the penalty phase.[24] Specifically, in finding counsel ineffective in Wiggins, the Supreme Court held that the "principal concern . . . is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." Id. at 522-23, 123 S.Ct. 2527. In Wiggins the Court determined that, as in Hannon's case, counsel's decision not to pursue mitigation was made prematurely when trial counsel "decided to focus their efforts on `retry[ing] the factual case' and disputing Wiggins' direct responsibility for the murder," even though extensive mitigation was available to present to the jury. Id. at 517, 123 S.Ct. 2527. This is precisely what defense counsel did in Hannon's case and why the outcome should be the same as in Wiggins. Noting the prevailing professional norms at the time of Wiggins' trial, the Supreme Court held that "[d]espite these well-defined norms, . . . counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Id. at 524, 123 S.Ct. 2527 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, at 133 (1989) [hereinafter "ABA Guidelines"]). Therefore, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Id. at 527-28, 123 S.Ct. 2527. Again, that is precisely what happened here.
In Wiggins the Court pointed out that counsel's responsibility to investigate was comprehensive and "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins, 539 U.S. at 524, 123 S.Ct. 2527 (quoting ABA Guidelines 11.4.1(C), at 93). The topics to be considered include "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Id. (citing ABA Guidelines 11.8.6, at 133). In Wiggins the Court found counsel's failure to investigate both deficient and prejudicial and directed that a new penalty phase with competent counsel be conducted. Id. at 535-36, 123 S.Ct. 2527.
Hannon's counsel was ineffective during the penalty phase first, because, as in Wiggins, he continued to present an "alibi" and "not guilty" strategy even though the jury had already unanimously rejected that strategy and found Hannon guilty of the crimes in this case; and second, because he fundamentally failed to investigate and present the substantial mitigating circumstances available. The United States Supreme Court's analysis and conclusion in Wiggins clearly apply here and mandate the same outcome.
A. "Nice Guy" mitigation
In approving defense counsel's conduct as competent, the majority ignores the United States Supreme Court's Wiggins *1154 analysis and its strict emphasis on counsel's obligation to investigate and prepare, as well as this Court's own case law on the duty to investigate, and instead concludes that "trial counsel's strategy in the instant case of presenting evidence to demonstrate that Hannon did not have the type of character to commit the murders was a tactical method used by trial counsel in an attempt to sway the jury's recommendation in favor of life over death." Majority op. at 1129. Essentially, the majority has written counsel a blank check to do anything counsel chooses without any judicial check on the effectiveness of counsel's "strategy." Hence, the outcome in this case represents another in the long line of appellate cases recognizing the right to competent counsel by its breach. If anything, the conduct of counsel here was even more deficient than that of counsel in Wiggins.
Even a cursory examination of defense counsel's testimony at the postconviction evidentiary hearing reflects his fundamental failure to understand defense counsel's obligation to investigate his client's background and prepare in advance for the penalty phase of a capital trial. Hannon's counsel asserted during the evidentiary hearing that the purpose of the penalty phase in this case "[w]as to try to save [Hannon's] life so that we could find the killers." (Emphasis supplied.) The following exchange during the direct examination of Hannon's trial counsel at Hannon's rule 3.851 evidentiary hearing further illustrates this fundamental failure:
Q. [T]he jury didn't believe your alibi defense, did it?
A. No, they did not.
Q. And so when you came back the next day, you were pretending perhaps or going on the theory that you still needed to convince them that Mr. Hannon was innocent?
A. I don't know about pretending, but you always have another chance to appeal to them in that phase, you know. They didn't believe it. Maybe they'll believe it now.
He also testified:
And we had decided that this was the position we were going to take. And then in the event that he was convicted, if we were to change that, if we were now to get up there and say I was there. I'm sorry. I didn't do it or any of that kind of stuffwhich I felt in those cases I prosecuted, I often felt those defense attorneys didn't handle that phase right. You know, they find somebody's convicted. Now they completely change their defense and get up there and take another tactic. We decided that wasn't what it was going to be because Mr. Hannon was adamant. I can't tell you how much he was adamant that he wasn't there. He didn't do this. He would never do this.
The sparse evidence that Hannon's counsel presented during the penalty phase of the trial focused solely on Hannon's claim of innocence and that Hannon was not the type of person to commit murder. For example, the entire testimony of Toni Acker, the sister of Hannon's co-assailant, was as follows:
Well, he was a good-time guy, carefree, liked to have fun. I can't believe that you have convicted him on this. He has even babysat my kid. He's even partied with [the victims], and I just don't believe that he couldhe would do anything nothing like that. I feel that it was drug related because of the way the way they were killed, and why would they go and kill their own friends?
Hannon's mother testified that "[h]e couldn't hurt anybody." Hannon's father *1155 testified that he believed Hannon was innocent and that "he ought to be given a chance to prove that he is innocent." Even during Hannon's counsel's closing argument in the penalty phase, he argued only innocence. Concerning Hannon's position that he was innocent, Hannon's counsel stated to the jury,
You don't agree with it, fine. But you have an opportunity to at least allow him to spend the rest of his life trying to clear his name. . . . Yes, we continue to maintain our not guilty, and we'll always continue to maintain not guilty. And what we're asking you to do is to give him a chance to clear his name and he's going to need a lot of time. If you put him on death row, he's got six years. That's not enough time.
What the majority fails to recognize in approving this strategy is the extensive legal precedent from this Court and other courts, including Wiggins, recognizing counsel's fundamental duty to investigate and prepare, and holding that an attempt to retry the guilt phase is not relevant or appropriate in a penalty phase proceeding.
What the prevailing law tells us, and tells defense lawyers, is that once a jury has determined that a defendant is guilty, then the issue of guilt or innocence is over, and such issue cannot be the appropriate focus of a penalty phase proceeding. In other words, counsel is charged with knowing the law and, under that law, he must move on in his obligation to investigate and provide an effective defense to the prosecution's case for the death penalty after the jury has rejected his innocence defense and convicted the defendant.
As in Wiggins, and directly on point to the issue now before us, this Court held in Rose v. State, 675 So.2d 567 (Fla.1996), that counsel's failure to investigate while latching onto an "accidental death" strategy during the penalty phase constituted ineffective assistance of counsel. Id. at 572-73. This Court stated that the "accidental death strategy" "appears to be closely akin to a claim of residual or lingering doubt, a claim which this Court has repeatedly held is not an appropriate matter to be raised in mitigation during the penalty phase proceedings of a capital case." Id. at 572 n. 5 (citing King v. State, 514 So.2d 354 (Fla.1987); Aldridge v. State, 503 So.2d 1257 (Fla.1987); Burr v. State, 466 So.2d 1051 (Fla.1985)); see also Trepal v. State, 846 So.2d 405, 434, 437 (Fla.2003) (finding that trial counsel was not ineffective for failing to present lingering doubt evidence even though the State stipulated and the trial court would have permitted its introduction); Darling v. State, 808 So.2d 145, 162 (Fla.2002) ("This Court has followed the holding of the United States Supreme Court that there is no constitutional right to present `lingering doubt' evidence."); Way v. State, 760 So.2d 903, 916 (Fla.2000) ("[T]his Court has previously rejected the argument that evidence that would serve only to create a lingering doubt of the defendant's guilt is admissible as a nonstatutory mitigating circumstance."). Similarly, the United States Supreme Court has explained:
Finding a constitutional right to rely on a guilt-phase jury's "residual doubts" about innocence when the defense presents its mitigating case in the penalty phase is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentencebut not the underlying convictionis struck down on appeal.
Franklin v. Lynaugh, 487 U.S. 164, 173 n. 6, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion) (citing Scott v. State, 310 Md. 277, 529 A.2d 340, 352 (1987); Stringer v. State, 500 So.2d 928, 946 (Miss. 1986); Whalen v. State, 492 A.2d 552, 569 (Del.1985); Lockhart v. McCree, 476 U.S. *1156 162, 205, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (Marshall, J., dissenting)).[25] As in Florida, the United States Supreme Court noted that its "prior decisions . . . fail to recognize a constitutional right to have [residual] doubts considered as a mitigating factor." 487 U.S. at 174, 108 S.Ct. 2320 (plurality opinion). The Court has recently reaffirmed its adherence to these views. See Oregon v. Guzek, ___ U.S. ___, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006). While the majority states that the Supreme Court has never resolved the issue of whether counsel is per se ineffective for pursuing a lingering doubt strategy in the penalty phase, Guzek is indeed instructive on the issue. In Guzek, the Court made the following observation regarding a defendant's desire to introduce new evidence at the penalty phase that he was not present at the scene of the crime:
That evidence is inconsistent with [the defendant]'s prior conviction. It sheds no light on the manner in which he committed the crime for which he has been convicted. Nor is it evidence that [the defendant] contends was unavailable to him at the time of the original trial. And, to the extent it is evidence he introduced at that time, he is free to introduce it now, albeit in transcript form. We can find nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new evidence of this kind at sentencing.
Id. at 1230-31 (citation omitted). The Court differentiated cases in which it had held that the Eighth and Fourteenth Amendments required that a defendant not be precluded from introducing "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," id. at 1231 (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion)), by stating that the evidence in those prior cases "was traditional sentence-related evidence, evidence that tended to show how, not whether, the defendant committed the crime. Nor was the evidence directly inconsistent with the jury's finding of guilt." Id. at 1231. The Court also noted, "[T]his Court's previous cases had not interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast `residual doubt' on his guilt of the basic crime of conviction. The Franklin [v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988),] plurality said it was `quite doubtful' that any such right existed." Id. at 1231-32. Finally, the Court stated that "sentencing traditionally concerns how, not whether, a defendant committed the crime," and that "the parties previously litigated the issue to which the evidence is relevantwhether *1157 the defendant committed the basic crime. The evidence thereby attacks a previously determined matter in a proceeding at which, in principle, that matter is not at issue. The law typically discourages collateral attacks of this kind." Id. at 1232 (citing Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). Based on the Court's reasoning in Guzek, it is logical to infer that counsel would be deemed per se ineffective for relying solely on evidence concerning whether the defendant had the character to commit the crime during the penalty phase, as Hannon's counsel did in this case.
In ignoring this case law and approving of counsel's performance here, the majority appears to adopt a three-step approach. First, it ignores the mandate for defense counsel's duty to investigate set out in cases like Wiggins and Rose; second, it transforms counsel's continuing assertion of innocence defense (explicitly disapproved of in Wiggins and Rose), into a "reasonable doubt" strategy; and, third, it approves of this freshly coined strategy as reasonable and effective even in the face of this Court's consistent holdings to the contrary.
In fact, the record reflects that counsel did not actually assert "lingering doubt" as that term is commonly understood. To say he did gives him way too much credit. "Lingering doubt" usually refers to the assertion of certain weaknesses in the State's case for guilt. Defense counsel did not do that. Rather, as noted above, he simply continued his claim, in the face of overwhelming evidence to the contrary, that his client was innocent and should receive a life sentence so he could continue to attempt to prove his innocence. This is, however, precisely the kind of conduct that this Court and the United States Supreme Court, in cases like Rose and Wiggins, have found to constitute ineffectiveness under Strickland. Any attempt by the majority to classify this strategy differently involves superficial semantics. See majority op. at 1127 n. 11 ("We reiterate that counsel's strategy was to demonstrate to the jury that Hannon in no way possessed the type of character to commit the crimes.").[26]
Contrary to this overwhelming precedent, some of which the majority sets out in its opinion, and as exemplified by the holdings in Wiggins and Rose, the majority holds that "[i]t is certainly logical that a jury of laypersons is less likely to recommend death if they have some lingering concerns about guilt than if there is absolute certainty on the issue of guilt." Majority op. at 1129-30. While this writer may agree with this statement in the abstract, it ignores and says nothing about what actually happened in this case or the state of our law on the issue and its relationship to counsel and his obligation to thoroughly investigate and present mitigation during the penalty phase of a capital *1158 case. In essence, the majority has transformed counsel's continuing innocence strategy into a lingering doubt strategy and then approved conduct by counsel that this Court and the United States Supreme Court have expressly forbidden.[27]
In addition to the wealth of legal precedent stating that lingering doubt evidence is not appropriate as mitigation during the penalty phase of a capital trial, it is apparent that it does not make sense in practice to rely blindly on a "my guy is too nice to have done it" theory after a jury has unanimously determined beyond a reasonable doubt that the defendant did do it. Maintaining such a head-in-the-sand posture after the jury has rejected it is akin to asking jury members to reverse themselves on the finding of guilt, after they have obviously anguished over such an important decision.
In other words, the penalty phase of a capital trial is not a second trial on guilt, but is rather a proceeding to determine the appropriate punishment, death or life in prison without parole, for someone who has already been adjudicated guilty. And, as the United States Supreme Court and this Court have repeatedly emphasized, the penalty phase is the time for counsel to investigate and prepare an effective defense of the State's case for the death penalty, by both rebutting the State's claims of aggravation and by putting on an effective claim of mitigation. That is what the trial judge explicitly tells the jury it must focus on by the court's instructions, and that is what defense counsel must focus on if it expects the jury to respond and to follow the trial judge's instructions.
B. Failure to Investigate Mitigation
Shockingly, the record reflects that Hannon's counsel did no investigation for mitigation, and, in fact, initially was not going to present any form of mitigation during the penalty phase, even a continuing claim of not guilty. Hannon's counsel stated at the postconviction evidentiary hearing, "Well, we had nothing to mitigate. He was not guilty. He didn't do it. That was it." However, at the penalty phase the trial judge actually directed him to reconsider this irrational strategy; thereafter, Hannon's counsel presented the evidence relating to the "my client is too nice to have done this" strategy. The following *1159 exchange at Hannon's postconviction evidentiary hearing aptly reflects Hannon's trial counsel's attitude and absolute default as to any investigation into mitigation:
Q. And so what did you do between the time when you said you weren't going to present any mitigation to the time that you said you were going to present mitigation? Did you do any investigation into Mr. Hannon's background whatsoever as to mitigation?
A. Well, no. The decision was made by him that we're not going to do that and I agreed with it. So what are we going to do a background investigation for? What's the point?
Hannon's counsel was also asked, "You hadn't provided any investigation, though, into his background as to what he could possibly be waiving, did you?" Hannon's counsel replied, "He knew what he was waiving."
The United States Supreme Court has continually reaffirmed the critical nature of counsel's duty to thoroughly investigate into mitigating factors that are to be presented during the penalty phase of capital cases. See Wiggins, 539 U.S. at 524, 536, 123 S.Ct. 2527 ("[C]ounsel were not in a position to make a reasonable strategic choice" regarding the presentation of mitigating evidence because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."); Williams v. Taylor, 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (stating that because "counsel did not begin to prepare for [the penalty phase] until a week before the trial" and failed to present the "voluminous amount of [mitigating] evidence . . ., trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); Strickland, 466 U.S. at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").
In its recent decision in Rompilla, for example, the United States Supreme Court held that trial counsel's assistance was ineffective because no reasonable efforts were made to review a prior rape conviction file when it was known that the State would introduce the prior conviction as aggravation through the notice of conviction as well as testimony from the rape victim in that case. 125 S.Ct. at 2464. The Court noted that this was "not a case in which defense counsel simply ignored their obligation to find mitigating evidence"; in fact, counsel had interviewed the defendant and members of his family, and also examined three mental health experts' opinions. Id. at 2462. The file contained, in addition to the conviction material, information about the defendant's childhood and mental disorders that would have served as helpful mitigation. Id. at 2468.
As in Wiggins, and directly on point to the case before us today concerning defense counsel's choice to continue only with an innocence strategy through the penalty phase, the Rompilla Court expressly rejected counsel's "few naked pleas for mercy" as inadequate and determined counsel's failure to investigate to be both ineffective and prejudicial. Id. at 2469. The Court explained:
This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, `might well have influenced the *1160 jury's appraisal' of [Rompilla's] culpability," Wiggins, 539 U.S., at 538, 123 S.Ct. 2527 (quoting Williams v. Taylor, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, Strickland, 466 U.S., at 694, 104 S.Ct. 2052.
Id. at 2469. Rompilla constitutes one in a long line of cases finding counsel's representation ineffective where mitigation was not thoroughly investigated and presented. In addition to Rompilla, Hannon's case is also similar in facts and circumstances to the United States Supreme Court cases in Williams and Wiggins. In Williams counsel did not begin preparing for the sentencing phase of the proceeding until a week before trial. 529 U.S. at 395, 120 S.Ct. 1495. Counsel failed to present evidence of the defendant's horrific childhood or of his borderline mental retardation and insufficient schooling. Id. The United States Supreme Court held that the defendant "had a rightindeed, a constitutionally protected rightto provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." Id. at 393, 120 S.Ct. 1495. "[T]rial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." Id. at 396, 120 S.Ct. 1495 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, at 4-55 (2d ed.1980)).
In Wiggins, discussed above, trial counsel, "well in advance of trial, decided to focus their efforts on `retry[ing] the factual case' and disputing [the defendant's] direct responsibility for the murder." 539 U.S. at 517, 123 S.Ct. 2527. Trial counsel ignored substantial mitigation, including a "bleak life history" involving sexual and physical abuse and a chronically alcoholic mother who neglected the defendant and his siblings. Id. at 516, 123 S.Ct. 2527. As in this case, trial counsel in Wiggins "attempt[ed] to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." Id. at 521, 123 S.Ct. 2527. However, the Supreme Court held that "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." Id. at 526, 123 S.Ct. 2527.
This Court has also consistently recognized counsel's duty to investigate into mitigating factors, and has reversed sentences where investigations into mitigating factors proved inadequate and prejudice resulted. Recently, in State v. Lewis, 838 So.2d 1102 (Fla.2002), we declared:
[T]he obligation to investigate and prepare for the penalty portion of a capital case cannot be overstatedthis is an integral part of a capital case. Although a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant is able to make an informed, intelligent decision.
Id. at 1113 (footnote omitted); see also Ragsdale v. State, 798 So.2d 713, 720 (Fla. 2001) (holding that counsel was ineffective when trial counsel failed to investigate into or present significant available mitigating evidence at the penalty phase); Rose, 675 So.2d at 570-74 (finding that counsel was ineffective at the penalty phase when failing to present evidence of severe mental disturbance and evidence of the defendant's alcoholism and mistreatment as a child); Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993) (finding that despite defendant's waiver, counsel was still ineffective for failure *1161 to investigate and prepare for penalty phase); Stevens v. State, 552 So.2d 1082, 1085-87 (Fla.1989) (finding ineffective assistance of counsel when counsel failed to investigate defendant's background, failed to present mitigating evidence during the penalty phase, and failed to argue on defendant's behalf).
The federal and state courts are uniform in their holdings that it is essential for counsel to fully investigate available mitigation in order to make an informed choice regarding whether to present the information or not. See Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.").[28] A reasonable investigation did not occur in this case. In fact, trial counsel failed to pursue any investigation, and the subsequent failure to present any mitigation evidence was unreasonable in light of all the circumstances of this case. See Rose, 675 So.2d at 572-73 (finding counsel's performance deficient because, due to "counsel's incompetency and lack of experience," counsel "never attempted to meaningfully investigate mitigation" when there was such mitigation available and "no investigation of options or meaningful choice").[29]
1. Failure to Prepare Adequately for Penalty Phase
In this case counsel's failure to investigate and present mitigation as mandated by case law was complete. The inadequacy of Hannon's counsel's performance included a failure to prepare adequately for the penalty phase, a failure to consider the *1162 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and other resources available to him, a failure to investigate available drug and alcohol abuse mitigation, a failure to investigate mental health mitigation, and a failure to investigate Hannon's family background.
Importantly, the majority fails to even acknowledge capital counsel's fundamental obligation to investigate his client's background and counsel's failure to meet this obligation, but rather continuously cites trial counsel's self-serving postconviction testimony and version of his discussions with Hannon's family to support its holding that trial counsel's strategy during the penalty phase was not faulty, without paying more than lipservice to Hannon's family's testimony regarding trial counsel's conduct. As noted above, Hannon's counsel claimed his strategy was only that Hannon was not the type of character to be involved in the crime that occurred. The majority cites penalty phase testimony from Toni Acker and Hannon's mother and father that he did not have the type of character to commit the crime, and holds that this testimony supports trial counsel's strategy. However, even as to this misguided and uninformed tactic, the majority fails to note that trial counsel's "investigation" and "preparation" consisted only of brief discussions with Hannon at the jail, brief discussions with his mother and father at the trial during breaks, and a brief discussion with Maureen Hannon outside the courtroom when she was called as a defense witness during the guilt phase. Hannon's counsel prepared Mr. and Ms. Hannon by simply telling them to "get up thereand remember this is our defense and basically you've just got to look at the jury and tell them what you feel from your heart. That was it."
Although Hannon's counsel stated that he had asked Hannon's family members if Hannon was "born with any problems" and the family members did not bring any mental health issues to his attention, the testimony of Hannon's family members tells a different story. Hannon's sister stated that Hannon's counsel never asked her about his life before the murders, his drug and alcohol use, or his home life. She asserted, "I had actually tried to contact [Hannon's counsel] on more than one occasion and he absolutely refused to listen to what I had to say or contribute. He did not want to talk to me at all. I never had a phone call returned." She was also listed as a witness for the penalty phase by Hannon's attorney but was never called during the penalty phase. Hannon's attorney erroneously had her listed as living in a different state even though she lived in Florida. She stated at the evidentiary hearing, "[Hannon's counsel] told me I had nothing to contribute and he didn't need me for anything."
Hannon's mother testified that Hannon's counsel did not prepare his family for their testimony at the penalty phase and did not explain the purpose of a penalty phase. At the evidentiary hearing, the following exchange occurred:
Q. Did [Hannon's counsel] ever tell you what a penalty phase was for?
A. No.
Q. Did [Hannon's counsel] ever discuss the purpose of mitigation in a death penalty phase?
A. I don't understand mitigation.
Q. Have you ever heard that word before? Mitigation?
A. No.
Q. Okay. Did you have any idea that the purpose of the penalty phase was to mitigate what the jury had the jury's verdict?

*1163 A. Oh, I understand. No.
Q. Did he ever explain to you that the jury didn't believe his alibi defense?
A. No.
Q. And that he now had to present something? That was never explained to you?
A. No.
Hannon's father testified that there was not even a discussion concerning the innocence defense, and Hannon's wife stated that Hannon's counsel never consulted with any family members about the penalty phase.
2. Failure to consult the American Bar Association (ABA) Guidelines and Other Resources
In its death penalty jurisprudence, and especially in its most recent decisions in Wiggins, Rompilla and Williams, the United States Supreme Court has repeatedly cited ABA standards to measure counsel's duty. When Hannon's counsel was asked if he had attended any death penalty seminars where defense attorneys are taught how to conduct a death penalty trial in accord with ABA standards, he expressed disdain for such professional activities:
No. And I'm not sure that you teach them that. You give them suggestions on what to do. But teach them? You know, you've got toyou've got to when you're in the game, when you're in the heat of battle, you've got toyou've got to fight the way you think it's supposed to be done. And, you know, you can go to a school, but I had a lot of practical experience in these cases [as a prosecutor].
Hannon's counsel had never tried a capital case as a defense attorney, and he did not consult with any experienced lawyers in capital cases.
Hannon's counsel had prosecuted capital cases before, but was unfamiliar with the ABA Guidelines for defense counsel conducting death penalty cases, which would have provided guidance to Hannon's counsel and which have consistently been cited by the United States Supreme Court as representative of prevailing standards for competent counsel.[30] These guidelines stress the importance of not only defense counsel's duty to investigate into mitigating factors, but also the idea that strategy can often shift between the guilt and penalty phases of a capital trial. ABA Guidelines 11.7.1(A) (stating that in forming a defense theory, "counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases"). ABA Guideline 11.4.1 states that investigation for the preparation of the sentencing phase should occur immediately even if the client initially asserts that no mitigation is to be offered. ABA Guidelines 11.4.1(C). In addition, "[i]f inconsistencies between guilt/innocence and penalty phase defenses arise, counsel should seek to minimize them by procedural or substantive tactics." ABA Guidelines 11.7.1(B). Moreover, counsel should consider interviewing "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." ABA Guidelines 11.4.1(D)(3)(B). Also, counsel should consider presenting witnesses at the sentencing phase that "relate[] to the client's life and development," as well as "[e]xpert witnesses to provide medical, psychological, *1164 sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor." ABA Guidelines 11.8.3(F)(1), (2).
As with his disdain for professional education, when asked about the ABA guidelines, Hannon's counsel replied, "I don't care what the . . . American Bar Association says. I don't care what anybody says. This is a decision I made. I'm the guy that makes those decisions [with the input of] the client, the parents, the sister, my co-counsel."
3. Drug and Alcohol Abuse Mitigation
The majority glosses over the fact that Hannon's counsel did not investigate any of Hannon's prior drug use because "[i]t had nothing to do with our defense." Hannon's counsel stated that "[h]e didn't have a cocaine problem" when asked if Hannon had cocaine problems before the trial, even though Hannon's counsel was aware of both Hannon's previous conviction for cocaine possession and delivery of cocaine, and of a charge of conspiracy to traffic in cocaine. He did not know that Hannon began using drugs and alcohol at age eleven and had a history of using LSD on a regular basis at the age of fifteen, as well as crystal methamphetamine, hallucinogenic mushrooms, and crack cocaine, nor did he know that Hannon was paranoid when under the influence of drugs. He did not question Hannon's parents concerning Hannon's expulsion from school for smoking marijuana. He did not know that Hannon's daily alcohol consumption before the murders was half a case of beer and a fifth of bourbon, and that on the night of the murders, Hannon drank almost two cases of beer.[31] Hannon's sister testified at the evidentiary hearing that Hannon's behavior was irritated and edgy leading up to the murders. He would drink excessively and use cocaine on a daily basis without sleeping at night. He also used acid a couple of times a month.
When asked about these issues, Hannon's counsel responded that "[i]t didn't come up because it wasn't an issue. . . . We weren't exploring those things," even though he knew that Hannon had been arrested for owning drug paraphernalia and marijuana plants. Of course, as noted above, that was only the tip of the iceberg concerning Hannon's drug use.
4. Mental Health Mitigation
Hannon's counsel was also unfamiliar with the prevailing death penalty case law on mitigation, such as Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and, critically, he did not have Hannon evaluated for any mental health issues prior to trial. See id. at 77, 105 S.Ct. 1087 (quoting Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), and stating that defendants must have "basic tools of an adequate defense or appeal" and that such tools should be provided if a defendant cannot pay for them). In Ake, the Court held:
[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.
*1165 Id. at 83, 105 S.Ct. 1087. Of course, counsel's lack of knowledge of the law cannot constitute tactical maneuvers. Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir. 1979).
The majority asserts that the present case is similar to the facts of Haliburton v. Singletary, 691 So.2d 466 (Fla.1997). In Haliburton, this Court held that counsel was not ineffective for failing to call a mental health expert, even though the expert "could have testified that there was a strong indication of brain damage." Id. at 471. However, the facts in Haliburton and this case are dissimilar. In Haliburton the decision not to present a mental health expert's testimony was deemed strategic "because she would have also testified that [the defendant] was an extremely dangerous person and that he was likely to kill again." Id. In Haliburton counsel made a strategic choice concerning the presentation of mitigating factors after investigating into them. Id. In the present case, however, counsel failed to conduct any reasonable investigation. Counsel could not have made a strategic choice concerning information unknown to him, and contrary to Haliburton, there is a reasonable probability in this case that the lack of meaningful mitigation undermined confidence in the outcome of the penalty phase.
No investigation into Hannon's mental state or possible brain damage occurred. Psychiatric mitigating evidence "has the potential to totally change the evidentiary picture." Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir.1988). This case stands in contrast to those cases where this Court has rejected claims of ineffective assistance when counsel decides not to present medical expert testimony after preparing properly and investigating into mitigating factors. See Rutherford v. State, 727 So.2d 216 (Fla.1998) ("[W]e find no error in the trial court's finding that trial counsel was aware of possible mental mitigation, but made a strategic decision under the circumstances of this case to instead focus on the `humanization' of [the defendant] through lay testimony."); Bryan v. Dugger, 641 So.2d 61, 64 (Fla.1994) ("This is not a case which defense counsel failed to prepare. Counsel had [the defendant] examined by seven mental health experts [but did not call a doctor] as a witness after the doctor told him that his testimony would not be helpful and that it suggested the possibility of malingering."). No investigation occurred in this case; therefore, Hannon's counsel could not have been in a position to make a strategic decision not to present mental health experts in mitigation.
According to the testimony of Robert Norgard, a criminal defense expert, it was standard practice for an effective capital defense attorney to hire a mental health expert for the penalty phase of a capital trial because brain damage is not always apparent to a lay person; it requires neurological testing. But Hannon's counsel did not do so. Instead, he stated, "And, why would I do that anyway? We're going to get up there and say he's crazy and, therefore, he shouldn't be killed? He wasn't crazy." He did not believe that Hannon had "a mental problem. . . . I think I know it when I see it." Hannon's counsel stated that he did not investigate Hannon's mental state or possible brain damage because he had no indication of it; he could "determine whether somebody's whacked," in his own words. Dr. Crown testified that in terms of general overall cognitive processing Hannon is within the average range; Hannon was, however, impaired on "the most critical subtest that relates to the possibility of brain damage. . . . [W]hat is very apparent is that [Hannon] has processing defects." But *1166 Hannon's counsel "didn't see anything. . . . Never heard of it until just now."
The evidence presented at Hannon's evidentiary hearing established that Hannon had a history of severe drug and alcohol abuse "to the point of blacking out and passing out," parental neglect, and neurological impairments resulting in poor impulse control and flawed decision-making. Drs. Crown and Sulton testified that Hannon's impairments impacted his daily functioning. Dr. Crown, board certified in neuropsychology, stated that Hannon was "having difficulty with cognitive processing" and that there was evidence of "head trauma from accidents, from being kicked, from falls." He also testified,
In terms of drug [e]ffects the greatest exposure to drugs and the greatest absorption level is in the fronto temporal area and actually the subcortical area relating to the limbic system. And these are areas that are responsible for concentration, attention, control of impulsivity, understanding the long-term consequences of immediate behavior and processing immediate memory, and also it aids in restoring memory function.
Dr. Crown also noted that Hannon suffered from rheumatic fever at age seven; its impact on his health was severe and he missed months of schooling. Hannon also suffered various head injuries, including losing consciousness at football practice in the ninth grade, getting kicked in the head by a bull, being hit by scaffolding at work, and being involved in several car accidents. "[R]apidly retrieving . . . information and applying it in a new situation is extremely difficult for him, and that's where he falls apart." Hannon was distracted very easily and has "difficulties under stress, pressure, drugs, lack of sleep, in fully comprehending information and attending to tasks."
Drs. Crown and Sulton both performed the Wechsler Adult Intelligence Scale Revised, which resulted in a very low score on the subtest that is most indicative of brain damage.[32] Also, Hannon told Dr. Sulton that he had gone AWOL from the military on three separate occasions. Dr. Sulton found several nonstatutory mitigators such as parental neglect, lack of structure, lack of discipline, lack of guidance in his childhood environment, and serious childhood illnesses. Dr. Sulton also termed him an "extreme follower" and found that Hannon had severe and chronic substance abuse problems, was impulsive, lacked concentration, and had personality changes due to his cocaine addiction. His score of global intelligence was average, but he scored an 8 out of 100 on the "digit symbol subtest" relating to "the rate of speed with which he is capable of learning symbol relationships," which could indicate a learning disability. Dr. Lipman, a neuropharmacologist, stated that Hannon would combine "smoking, drinking, taking acid and Quaaludes" as a teenager and this could have had a long-term effect on his brain, even before he moved on to crystal meth and cocaine. Even the State's witness, Dr. Sidney Merin, agreed that Hannon had "a polysubstance abuse disorder." Therefore, if he had performed an investigation, Hannon's counsel could have presented substantial and persuasive testimony concerning Hannon's mental health to establish a case of mitigation.
*1167 5. Family Background Mitigation
Counsel did not question Hannon's parents about his background because "[he] had no indication that it was bad." Regarding Hannon's school, military, or medical records, the following colloquy took place at the postconviction hearing:
Q: [D]id you obtain any of Mr. Hannon's school records?
A: No.
Q: Did you obtain his military records?
A: No.
Q: Did you know he was in the army?
A: I don't recall.
Hannon's counsel could not remember if he knew that Hannon dropped out of school when he was sixteen. The evidence presented below established that Hannon's parents were constantly absent during Hannon's childhood because Hannon's sister suffered from scoliosis, which required treatment in another town. Hannon's sister testified that their parents drank to excess often and the children "got some real good beatings." Concerning the beatings, Hannon's sister stated, "My mother had two favorite things she did. One was just grab you by the back of your hair and slam your head in the wall." Hannon's sister also testified, "I can't ever remember my parents ever saying the words I love you to my face, not ever." Hannon's sister left home five days after she turned eighteen because she "hated it." Also, a cousin that Hannon considered a father figure committed suicide. Hannon's sister stated that Hannon went from "job to job, place to place."
There was also substantial evidence presented that Hannon needed approval from his sister and friends, and Dr. Sulton and Maureen Hannon both testified that Hannon was a follower. Hannon's mother stated that Hannon had a very close relationship with his sister Maureen, who began using drugs and alcohol, running away, and cutting school at the age of thirteen. Hannon's parents kicked her out of the house when she was sixteen. There was evidence that he also sought approval from his codefendant Richardson, but Hannon's counsel stated, "Nobody substantially dominated Pat Hannon. He was an imposing presence himself."
The majority has sub silentio chosen to treat this case as one where counsel did do a thorough job of investigation but then made a "strategic" choice as to what mitigation to present. However, it goes without saying that counsel must first be informed as to available mitigation to be in a position to make a reasonable strategic choice as to what to focus on in mitigation, and the obligation to investigate mitigation before making the choice is fundamental to the role of defense counsel. Wiggins, 539 U.S. at 536, 123 S.Ct. 2527. In Hannon's case, counsel's failure to carry out this fundamental obligation was not based on strategy. None of the mitigation evidence set out above was discovered by Hannon's defense counsel or presented as mitigation during the penalty phase of the proceedings. Counsel was not aware of and did not present any of the abundant mitigating evidence that has been demonstrated without dispute to have been available; instead, he simply continued with his "nice guy" strategy by asking vague questions on direct examination of the defense penalty phase witnesses concerning their feelings about whether Hannon could have committed the crime. This questioning simply indicates that Hannon's counsel failed completely to prepare for the penalty phase of the trial except to continue with his "nice guy" strategy.
II. Prejudice
There can be no doubt that the quantity and quality of the mitigation evidence established *1168 without dispute at the postconviction hearing was of the nature contemplated in Williams that "might well have influenced the jury's appraisal of [the defendant's] moral culpability" or was of the kind that "may alter the jury's selection of penalty." Williams, 529 U.S. at 398 120 S.Ct. 1495. This substantial evidence of mitigation stands in stark contrast to the legally indefensible position taken by counsel at the penalty phase.
To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The defendant is not required to show that the deficient performance "more likely than not altered the outcome in the case." Id. at 693, 104 S.Ct. 2052. He must only show that unpresented available evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability" or "may alter the jury's selection of penalty." Williams, 529 U.S. at 398, 120 S.Ct. 1495; see also Asay v. State, 769 So.2d 974, 985 (Fla.2000) ("When evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness `deprived the defendant of a reliable penalty phase proceeding.'").
The United States Supreme Court has held that the jury must weigh mitigating evidence that meets a "low threshold for relevance." Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (quoting Tennard v. Dretke, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004)). In Smith, the Court held, "Because petitioner's proffered evidence was relevant, the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence." Id. at 45, 125 S.Ct. 400. The Court in Tennard spoke of its broad view regarding the defendant's presentation of mitigating evidence:
When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in McKoy v. North Carolina, 494 U.S. 433, 440-441 [, 110 S.Ct. 1227, 108 L.Ed.2d 369] (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard"`"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"'" applies. Id., at 440[, 110 S.Ct. 1227] (quoting New Jersey v. T.L.O., 469 U.S. 325, 345[, 105 S.Ct. 733, 83 L.Ed.2d 720] (1985)). We quoted approvingly from a dissenting opinion in the state court: "`Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" 494 U.S., at 440[, 110 S.Ct. 1227] (quoting State v. McKoy, [323 N.C. 1,] 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C.J.)). Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441[, 110 S.Ct. 1227].
Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. Boyde v. California, 494 U.S. 370, 377-378[, 110 S.Ct. 1190, 108 L.Ed.2d 316] (1990) (citing *1169 Lockett v. Ohio, 438 U.S. 586[, 98 S.Ct. 2954, 57 L.Ed.2d 973] (1978); Eddings v. Oklahoma, 455 U.S. 104[, 102 S.Ct. 869, 71 L.Ed.2d 1] (1982); Penry [v. Lynaugh], 492 U.S. 302[, 109 S.Ct. 2934, 106 L.Ed.2d 256] (1989)); see also Payne v. Tennessee, 501 U.S. 808, 822[, 111 S.Ct. 2597, 115 L.Ed.2d 720] (1991) ("We have held that a State cannot preclude the sentencer from considering `any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances" (quoting Eddings, [455 U.S.] at 114[, 102 S.Ct. 869])).
542 U.S. at 284-85, 124 S.Ct. 2562 (parallel citations omitted). Moreover, Florida's Standard Jury Instructions state, "A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If [the jury is] reasonably convinced that a mitigating circumstance exists, [it] may consider it as established." Fla. Std. Jury Inst. (Crim.) 7.11. "A mitigating circumstance can be defined broadly as `any aspect of a defendant's character or record and any of the circumstances of the offense' that reasonably may serve as a basis for imposing a sentence less than death.'" Campbell v. State, 571 So.2d 415, 419 n. 4 (Fla.1990) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).
The trial court did not reach the issue of prejudice because it determined that counsel was not deficient, and the majority expresses a belief "that the evidence in mitigation presented during the postconviction proceedings was equivocal and not `abundant.'" Majority op. at 1136 note 18. However, it is apparent from the testimony at the postconviction evidentiary hearing that there was voluminous evidence of mitigation that the jury should have been given the opportunity to consider in determining Hannon's sentence. That is the fundamental purpose of a penalty-phase proceeding. That fundamental purpose cannot be achieved in cases where defense counsel, as here, essentially defaults in carrying out his responsibility to investigate and present available mitigation so as to give the jury no meaningful choice in its penalty phase deliberations. No choice was presented here.

CONCLUSION
Under Strickland, Wiggins, and other United States Supreme Court and Florida decisions discussed above, Hannon was entitled to an adequate defense and an adversarial testing of the State's prosecution of the death penalty. In our adversarial system of justice, the jury may only utilize that evidence of mitigation supplied to it by defense counsel when making a decision concerning punishment. No material mitigation was supplied to the jury in Hannon's penalty phase; instead Hannon's counsel chose to continue arguing innocence, an argument the jury had emphatically already rejected. Hence, in the face of this default by counsel, the jury was left with no choice but to impose the death penalty. Absolutely no mitigation was presented on behalf of Hannon, thereby resulting in a breakdown of our adversarial system as discussed by the Supreme Court in Strickland and Wiggins, and which resulted in the defendant being deprived of a reliable penalty-phase proceeding.
Having demonstrated both deficient performance and prejudice at the evidentiary hearing below, Hannon should be entitled to a new sentencing proceeding in which he will be represented by competent counsel prepared to contest the State's case for the death penalty by presenting the voluminous *1170 evidence of mitigation presented at the postconviction hearing.
PARIENTE, J., concurs.
NOTES
[1] Hannon's postconviction motion was filed under Florida Rule of Criminal Procedure 3.850 on March 17, 1997, and his amended 3.850 postconviction motion was filed on April 10, 2000. The current version of the rule, Florida Rule of Criminal Procedure 3.851, "appl[ies] to all postconviction motions filed on or after October 1, 2001." Fla. R.Crim. P. 3.851(a).
[2] These claims included: (I) the lack of funding to investigate postconviction claims violated Hannon's constitutional rights and the dictates of Spalding v. Dugger, 526 So.2d 71 (Fla.1988); (II) requiring Hannon to file a motion under Rule of Criminal Procedure 3.851 one year after his conviction had become final violated his due process and equal protection rights; (III) Hannon was deprived of his due process rights and rights under the Fifth, Sixth, and Eighth Amendments because the State withheld evidence that was material and exculpatory or presented misleading evidence or both; (IV) Hannon was denied effective assistance of counsel pretrial and at the guilt phase in violation of his Sixth, Eighth, and Fourteenth Amendment rights; (V) Hannon was deprived of his due process rights when unreliable and nonscientific evidence was presented at his trial in violation of the Sixth and Fourteenth Amendments and Frye v. United States, 293 F. 1013 (D.C.Cir.1923); (VI) Hannon's trial counsel was operating under a conflict of interest which violated Hannon's Fifth, Sixth, and Fourteenth Amendment rights; (VII) the State's use of jailhouse informants violated Hannon's Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (VIII) the State's use of misleading testimony and improper argument undermined the reliability of Hannon's trial; (IX) Hannon was denied effective assistance of counsel at the penalty phase and during sentencing in violation of his Sixth, Eighth, and Fourteenth Amendment rights; (X) Hannon was denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), when counsel failed to obtain an adequate mental health evaluation and failed to provide the necessary background information to the mental health experts; (XI) Hannon's sentencing jury was misled by comments, questions, and instructions that unconstitutionally diluted the jury's sense of responsibility; (XII) the trial court erroneously found one of the aggravators to be that the murder occurred during the commission of a felony, and that finding was an automatic aggravating factor; (XIII) the avoiding or preventing a lawful arrest aggravator is unconstitutionally vague, was improperly applied, and the jury received inadequate instructions; (XIV) the trial court committed fundamental error by instructing the jury regarding the HAC aggravator when the factor did not apply, and the jury instruction was unconstitutionally vague; (XV) the jury's death recommendation was tainted by consideration of invalid aggravating circumstances; (XVI) Hannon is "innocent of the death penalty"; (XVII) the rules prohibiting Hannon's postconviction counsel from interviewing jurors to determine if constitutional error was present during his trial violated Hannon's constitutional rights; (XVIII) Florida's capital sentencing law is unconstitutional on its face and as applied because it fails to prevent the arbitrary and capricious imposition of the death penalty and violates the due process and cruel and unusual punishment clauses; (XIX) newly discovered evidence demonstrates that Hannon's convictions and sentences are constitutionally unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments; (XX) Hannon's death sentences violate the Fifth, Sixth, Eighth and Fourteenth Amendments because the law shifted the burden of proof to Hannon to prove that death was inappropriate, and the trial judge used that presumption in rendering a sentence; and (XXI) the cumulative effect of the procedural and substantive errors during the trial court proceedings denied Hannon of his right to a fair trial.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] On March 2, 2001, the trial court entered its first order denying in part Hannon's first amended postconviction motion and granting an evidentiary hearing on certain of Hannon's postconviction claims. On March 12, 2001, Hannon filed a motion for reconsideration, claiming that the trial court had not held a Huff hearing to which he was entitled. On November 6, 2001, the trial court granted Hannon's motion for reconsideration, finding that Hannon was entitled to a Huff hearing, and vacated its March 2, 2001 order.
[5] Specifically, the trial court determined an evidentiary hearing was warranted for claims IV (in part), V (in part), IX, X (in part), XVI (in part), XIX (in part), and XXI.
[6] Hannon testified during the guilt phase that at 10 p.m. on January 10, 1991, the date of the crime, he was at Ron Richardson's house playing a drinking game, Quarters, and that both Ron and Mike Richardson were there. Hannon testified that he left Richardson's house the next morning at 6:30 a.m. Hannon also testified that he was not involved in the homicides.
[7] Hannon also claims that the trial court did not address the significance of Bunker's testimony on the penalty phase of trial and thus overlooked the relevance of Bunker's testimony as it pertains to the HAC aggravator. However, this Court upheld the application of HAC as to both murders without relying on Bunker's blood spatter testimony. See Hannon, 638 So.2d at 43.
[8] The dissent asserts that when trial counsel initially stated that he would not be offering evidence in mitigation, the trial court "directed [counsel] to reconsider" his decision, see dissenting op. at 1158; however, the trial court merely gave Hannon's trial counsel overnight to review pertinent case law and "thoroughly discuss whether or not the defendant should put on mitigating evidence." With regard to the initial decision not to present mitigation, trial counsel stated, "We have discussed it, but I was expressing [Hannon's] wishes. I will continue to discuss it." (Emphasis supplied.) Even the trial judge expressly noted that "[i]f Mr. Hannon knowingly and intelligently waives his right to present mitigating evidence or circumstances, he has that right under the law."

In Koon v. Dugger, 619 So.2d 246, 250 (Fla.1993), this Court acknowledged the "problems inherent in a trial record that does not adequately reflect a defendant's waiver of his right to present any mitigating evidence" and announced the following prospective rule to be applied in such situations:
When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
Id. at 250. Hannon's trial preceded this Court's decision in Koon. Therefore, counsel could not benefit from the aforementioned rule in memorializing on the record that Hannon had knowingly and voluntarily waived the presentation of any type of mitigation that would detract from Hannon's assertion that he was not at the crime scene and he did not possess the type of character to commit the murders.
[9] Trial counsel testified that Hannon understood the jury process and his rights in the criminal proceedings, that he paid attention to the progress of his case, and that he exhibited no signs of mental impairment.
[10] Hannon's decision not to present evidence in mitigation is demonstrated by Mrs. Hannon stating as she testified at the penalty phase that Hannon "didn't want us to [testify] because he knows how badly we're hurting."
[11] Contrary to the dissent's assertion, we have not "transformed counsel's continuing innocence strategy into a lingering doubt strategy" or a "reasonable doubt" strategy. Dissenting op. at 1158. We reiterate that counsel's strategy was to demonstrate to the jury that Hannon in no way possessed the type of character to commit the crimes. Counsel also testified at the postconviction hearing that it was his strategy to persuade the jurors to recommend life over death by virtue of the fact that Hannon, who had already been found guilty of two murders, was not "begging for his life" but instead addressed and emphasized demeanor and character to continue to insist that he did not and could not commit the crimes.
[12] In none of the cases cited by the dissent does the United States Supreme Court address the effectiveness of counsel for arguing that the commission of a murder was completely out of line with a defendant's character. Hence, contrary to the dissent's claim that we are ignoring Supreme Court case law on lingering doubt, see dissenting op. at 1157, we instead conclude that such case law is not dispositive as to the issue that we decide today.

Moreover, to the extent the dissent asserts that in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court, and in Rose v. State, 675 So.2d 567 (Fla.1996), this Court "explicitly disapproved" of a continuing assertion of innocence defense, see dissenting op. at 1157, this statement is misdirected. In neither Wiggins nor Rose did the Court hold that counsel was ineffective for pursuing an innocence strategy, nor prohibit a defense based on the character of the defendant. Rather, in both cases the Courts found that counsel was ineffective for failing to adequately investigate into mitigation that could have been discovered had counsel conducted a reasonable investigation. The instant case is distinguishable from Wiggins and Rose in that Hannon's counsel made a reasoned decision to limit his investigation into mitigation based on Hannon's express desire that he pursue a strategy that Hannon did not possess the type of character to commit the murders. Further, the instant case is distinguishable from Rose in that, while counsel in Rose pursued a penalty phase strategy that he believed to be ill-conceived, counsel in the instant case agreed with his client that maintaining a consistent position during the penalty phase was a viable strategy.
[13] See also King v. Dugger, 555 So.2d 355, 360 (Fla.1990) (Barkett, J., dissenting) ("I believe that a jury is entitled to, and often does, mitigate a sentence because of `lingering doubt' about the defendant's guilt."); Melendez v. State, 498 So.2d 1258, 1263 (Fla.1986) (Barkett, J., specially concurring) ("There is certainly nothing irrationalindeed, there is nothing novelabout the idea of mitigating a death sentence because of lingering doubts as to guilt.") (quoting Heiney v. Florida, 469 U.S. 920, 921, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984) (Marshall, J., dissenting from denial of certiorari)); see also Way v. State, 760 So.2d 903, 924 (Fla.2000) (Pariente, J., concurring) ("I urge the Legislature [to] consider including evidence of residual doubt as a statutory mitigating factor that could be considered by juries in making a sentence recommendation, the trial court in imposing the death sentence, and this Court in determining whether the death penalty should be affirmed."). Although the dissent criticizes the reference to these views, they are presented not for authority, but for the common sense and grounded logic they set forth.
[14] The dissent proclaims that counsel was "unfamiliar with the prevailing death penalty case law on mitigation, such as Ake v. Oklahoma," see dissenting op. at 1164; however, this statement is hugely conclusory and not supported by the postconviction evidentiary transcript. The dissent takes counsel's statement that he was not familiar with the Ake case "off the top of my head," and untenably uses this one statement to reach the sweeping conclusion that counsel lacked knowledge about case law concerning mitigation in death penalty cases. Indeed, it is a conclusory statement in itself to presume that any particular case is "prevailing" in a particular legal area. Further, the Ake case is not even relevant to the instant proceedings because counsel's strategy during the penalty phasea strategy that Hannon himself approvedwas to present evidence that Hannon did not possess the character to commit the murders and that he was innocent of the crimesnot that he suffered from some sort of brain injury or mental illness at the time of the murders.
[15] The Supreme Court noted in part that further inquiry likely would have revealed repeated incidents of sexual abuse suffered by Wiggins that could have been offered in mitigation. See id. at 525, 123 S.Ct. 2527.
[16] Dr. Sulton testified that Hannon had a verbal IQ of 112, which is bright to average, a performance IQ of 102, which is average, and full scale IQ of 108, which is average.
[17] At the evidentiary hearing, information regarding Hannon's drug and alcohol abuse as well as his upbringing and family situation was presented through the testimony of Hannon's family. Hannon's mother, father, and two sisters (Hellen Coker and Moreen Hannon) testified that their home life was difficult, especially when Stephanie, another of Hannon's sisters, had scoliosis, at which time the parents were barely home. Hannon's mother and father both testified with regard to the problems they had with Moreen, who began abusing drugs and alcohol at age thirteen and had a close relationship with Hannon. Moreen also testified with regard to her running away from home as well as her alcohol and drug use. Hannon's mother testified that Hannon was a very good kid, had many friends, had developed rheumatic fever when he was seven or eight and was out of school for a few months, and was a pretty good student.

Moreen seemed to have more specific information with regard to Hannon's substance abuse than the rest of his family. Moreen testified that she was aware of Hannon's drug and alcohol use while growing up, that Hannon's drug use escalated over the years, that Hannon drank on a regular basis in 1990, and that she, Hannon, Ron Richardson, and Mike Richardson all drank alcohol as well as used cocaine. Moreen also testified that Hannon was a good worker and did not have any trouble getting a job although he moved around from job to job, and she described Hannon's behavior as agitated and irritated in 1990 during the time leading up to the murders. Hellen also testified that Hannon drank frequently when he was a teenager, and that Hannon was drinking and doing drugs excessively in 1990. Hannon's mother and father testified that they were unaware of the existence and extent of the substance abuse problem that emerged during Hannon's youth.
[18] For example, the dissent references Hellen Coker's testimony wherein she alleges physical abuse and emotional indifference by her parents. However, contrary to Hellen's testimony, Hannon's mother testified that she told her children that she loved them and hugged them, bought them birthday and Christmas presents, and that she never "smashed their face[s] into the wall." Hannon's father testified that he never spanked his children or struck them with a belt. While Mrs. Hannon admitted that she drank "a lot of wine," she also believed that it did not affect her ability to take care of the house and her children because "the kids looked terrific. The house was great." Despite the fact that Hannon developed rheumatic fever as a child, Hannon's mother testified that he did not have to make up the time he missed from school because his illness occurred partly during the summer, and further, "[Hannon] was a pretty good student, so he was okay." The dissent further takes out of context Hellen's statement that she left home five days after she turned eighteen because she "hated it." A review of her full testimony reveals that her home situation was not the only factor that led to her departure: "I hated it. I didn't like my home life. I didn't like the town we lived in. I mean you couldn't sneeze without somebody calling. They knew everything that went on. I just wanted to get away from there. Something different." Finally, Dr. Merin testified that when he asked Hannon about his relationship with his father, Hannon stated, "I got along great with him. My only regret was that he was away so much." As to his mother, Hannon stated that they "[g]ot along great" and that he, as the Hannons' only son, received lenient treatment. In noting such testimony, we do not seek to present a lopsided view of Hannon's childhood in an effort to demonstrate that any existing mitigation was minimal. Rather, we only do so to demonstrate that the evidence in mitigation presented during the postconviction proceedings was equivocal and not "abundant," as the dissent proclaims. See dissenting op. at 1167. The dissent characterizes our discussion of these elements of Hannon's background as mere "lip service," see dissenting op. at 1162; however, the dissent lacks any basis for this assertion other than its subjective disagreement with our conclusion regarding the insignificance of the mitigation evidence presented at the postconviction hearing.
[19] Hannon asserts he was denied effective assistance of counsel because his trial counsel failed to adequately challenge the aggravators. However, once Hannon was convicted of the murders based on the facts in evidence, regardless of what trial counsel would have argued, the prior violent felony aggravator (contemporaneous killings) and the committed during a burglary aggravator were applicable as a matter of law. Although trial counsel in the instant case arguably could have more effectively challenged the HAC and the avoiding or preventing a lawful arrest aggravators during the penalty phase, the nature of the murders and facts in evidence in this case support the application of these aggravators, which were both challenged and upheld on direct appeal. See id. at 43-44. Thus, assuming without deciding whether trial counsel was deficient in challenging the aggravators, this claim is meritless because Hannon has failed to demonstrate prejudice.
[20] To demonstrate a Brady violation, Hannon must allege specific facts that, if accepted as true, establish a prima facie case that (1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Allen v. State, 854 So.2d 1255, 1259 (Fla.2003).
[21] To establish a Giglio violation, Hannon must demonstrate that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. See Guzman v. State, 868 So.2d 498, 505 (Fla.2003); Ventura v. State, 794 So.2d 553, 562 (Fla.2001).
[22] Hannon has failed to identify what specific information was revealed during Acker's trial that would have shown that Hannon was not the most culpable defendant.
[23] Defense counsel's conduct during the guilt phase was also deficient. However, the State's strong case on guilt has convinced me that no prejudice can be demonstrated by counsel's neglect. The following questionable conduct deserves mention, however.

Even though Hannon's alibi defense fell completely apart when his bloody palm print was found at the murder scene, Hannon's counsel did not change his alibi strategy at the guilt phase. Critically, Hannon's counsel failed to depose or authorize an investigation into the background of Ron Richardson, the accessory after the fact of the murder who was scheduled to testify in Hannon's defense, even when the State advised Hannon's counsel that Richardson had changed his story and was now going to testify against Hannon. The trial judge gave Hannon's counsel the opportunity to depose Richardson after the State disclosed that Richardson would be a witness for the State, but Hannon's counsel asserted, "Your Honor, I don't intend to take a discovery deposition." When the court asked Hannon's counsel again if he intended to take a discovery deposition of Richardson, he replied, "Absolutely not." When asked a third time if he was sure he did not want to take Richardson's deposition, Hannon's counsel said, "I don't need to take his discovery deposition, Your Honor."
The majority accepts Hannon's counsel's explanation for failing to depose Richardson that he believed Richardson's story was fabricated and the best strategy would be simply to question him in front of the jury without a depositionand calls this "a carefully considered and planned defense strategy." Majority op. at 1121. The majority states that Hannon's counsel's tactics concerning Richardson's testimony were "ultimately successful" because "Richardson actually knew very little with regard to the victims' apartment," and he "conveniently testified that he was leaving the apartment as the shooting of Snider occurred." Majority op. at 1120. However, Richardson testified that he was not familiar with the apartment because he had only been there once before the murders for no longer than fifteen minutes, making it very plausible that Richardson could not answer Hannon's counsel's detailed questions about the contents of the apartment. Also, Richardson gave detailed credible testimony about the murders themselves, contrary to the majority's assertion that defense counsel's tactics were "ultimately successful." Majority op. at 1120.
Hannon's counsel thought that he could discredit Richardson because he had Richardson's brother on tape affirming Hannon's alibi. However, Hannon's counsel also neglected to fully prepare or investigate Richardson's brother, and when Hannon's counsel called Richardson's brother to the stand, Richardson's brother stated that he lied on the tape, asserted that he was "not going to get [him]self in trouble for someone else," and changed his story to discredit Hannon's alibi even more. The majority's only mention of this disastrous direct examination is: "Hannon's counsel also testified that it was his intention to impeach Richardson with the testimony of his brother, Mike, who was expected to testify that Hannon and Richardson were at Richardson's house at the time of the murder playing a drinking game." Majority op. at 1120. The majority also states that Hannon's counsel successfully revealed that Richardson had given statements to Hannon's counsel supporting Hannon's alibi, but Richardson also testified during the trial that he had lied in all these previous statements. Pretrial depositions would have prepared Hannon's counsel for Richardson's and his brother's damaging trial testimony, and surely would have indicated to Hannon's counsel that Hannon's alibi defense vanished the moment Richardson decided to testify for the State. Instead, Hannon's counsel continued with the alibi defense without adequate investigation while ignoring all other possible defenses. Hannon's counsel also did not investigate Richardson's drug dealings with Hannon or his influence over Hannon because "[t]hat wasn't the [alibi] strategy."
Additionally, Hannon's counsel did not investigate the State's blood spatter expert Judith Bunker's educational background. Bunker's testimony was used by the State to prove that the murders were heinous, atrocious, and cruel. If Hannon's counsel had investigated, he would have found numerous falsities on her curriculum vitae, which would have discredited the State's case.
[24] In our recent decision on rehearing in Rodriguez v. State, 919 So.2d 1252 (Fla.2005), we noted the essential facts of Wiggins while distinguishing them from the situation in Rodriguez: "This case is distinguishable from Wiggins, in which counsel curtailed their investigation of mitigating evidence in favor of the alternative strategy of convincing the jury that the defendant was not directly responsible for the murder." Id. at 1264 (citation omitted).
[25] The majority points to Lockhart's majority opinion as supporting the notion that it is reasonable strategy to rely on a jury's "residual doubts" during the penalty phase of a capital trial. See majority op. at 1130 (citing Lockhart, 476 U.S. at 181, 106 S.Ct. 1758). However, the Lockhart majority was adopting the State's argument in favor of a unitary jury system, and admitted that there is some justified "skepticism as to the extent to which . . . States are willing to go to allow defendants to capitalize on `residual doubts.'" Lockhart, 476 U.S. at 181, 106 S.Ct. 1758. In his dissent, Justice Marshall pointed out that when a defendant's sentence is set aside on appeal, he is routinely resentenced by a completely different jury than the one that found him guilty, making it impossible for the defendant to benefit from a "residual doubt" theory during the penalty phase because the jury members were not present for the guilt phase and there is no reassessment of culpability. Id. at 205, 106 S.Ct. 1758 (Marshall, J., dissenting). If "residual doubts" were such an important aspect of our death penalty scheme, such resentencing procedures would be invalid.
[26] The majority cites to Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 787 (11th Cir. 2003), stating that the Eleventh Circuit held that there was no deficiency in counsel's focusing on acquittal at trial and focusing on residual doubt instead of other forms of mitigation at sentencing. Majority op. at 1129. However, in Parker, previous counsel had retained a psychiatrist who evaluated the defendant and investigated thoroughly into the defendant's family background, discovering that the family members were "unconcerned or uncooperative." Parker, 331 F.3d at 781-82. Counsel also decided not to introduce drug abuse evidence because it was inconsistent with the defendant's participation in a drug treatment program in prison. Id. at 782. This type of strategy was hardly the case in Hannon's penalty phase. Also, in Parker, the defendant had been convicted of two prior murders, making the aggravating factors substantial and the prejudice for not introducing mitigation very minimal. Id. at 788-89.
[27] In attempted support of the choice of strategy theory, the majority cites dissenting and concurring opinions from this Court stating the beliefs of individual justices regarding the effect of lingering doubt on a penalty phase jury. Majority op. at 1129-30 n. 13 (citing King v. Dugger, 555 So.2d 355, 360 (Fla.1990) (Barkett, J., dissenting); Melendez v. State, 498 So.2d 1258, 1263 (Fla.1986) (Barkett, J., specially concurring); Way, 760 So.2d at 924 (Pariente, J., concurring)). Obviously, the individual minority views of some members of this Court do not constitute the prevailing law on the issue, especially as that law affects counsel's conduct and obligation to investigate and present genuine mitigation evidence. I concurred with Justice Pariente's concurrence in Way, in which she stated, "I believe that the nature and strength of the evidence of guilt should be considered in deciding whether to impose the death sentence and in whether to uphold a death sentence." 760 So.2d at 924 (Pariente, J., concurring). Justice Pariente urged the Legislature to consider implementing lingering doubt as a statutory mitigating factor in order to ensure justice. Id. I share this belief because evidence that may be strong enough to convict a defendant of first-degree murder might not rise to the level of supporting the death penalty; this could be pointed out convincingly, along with other mitigation, by a skillful defense attorney during the penalty phase of a capital trial. However, once again, the belief that lingering doubt could constitute valid mitigation does not reflect the law as it now stands. And, of course, the issue we face is whether Hannon's counsel was ineffective in failing to investigate and prepare, and instead relying exclusively on a claim of innocence during the penalty phase of the trial.
[28] The majority argues that Hannon's counsel could not benefit from this Court's decision in Koon v. Dugger, 619 So.2d 246 (Fla.1993), in which this Court announced a prospective rule that a defendant must inform the trial court on the record that he refuses to present any mitigating evidence. Majority op. at 1126 note 8 (quoting Koon, 619 So.2d at 250). However, the case that Koon differentiates, Blanco v. Singletary, 943 F.2d 1477 (11th Cir.1991), is more similar to the facts of the present case. In Blanco, the Eleventh Circuit stated that

a defendant's desires not to present mitigating evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial: "The reason lawyers may not `blindly follow' such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit."
Id. at 1502 (quoting Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir.1986)). Counsel in Blanco had not investigated into mitigation until the end of the guilt phase, and the Eleventh Circuit held, "The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto Blanco's statements that he did not want any witnesses called." Id. at 1503. Similarly, Hannon's counsel reiterated continuously that it was Hannon's choice not to present mitigating evidence during the sentencing phase of his case. However, Hannon's decision could not have been made without adequate investigation by his counsel and consultation between Hannon and his counsel.
[29] The majority attempts to distinguish Rose, stating that in the present case, Hannon's counsel made a reasoned decision to limit his investigation into mitigation based on Hannon's desire to do so. However, as stated in Blanco, counsel has a duty not to blindly follow his client's desire to limit mitigation before evaluating potential mitigation. 943 F.2d at 1502. In addition, the majority distinguishes Rose because counsel in Rose pursued a strategy that he believed to be ill-conceived, whereas Hannon's counsel did not possess this belief. See majority op. at 1129 n. 12. Whether a defendant's counsel admits his strategy is faulty or falsely believes it to be valid should be of no moment in this Court's evaluation of whether counsel's performance was deficient in a capital case with consequences as severe as death.
[30] The 1989 ABA Guidelines were superseded by a revision in 2003, but the 1989 version of the guidelines were in effect at the time of Hannon's trial.
[31] Hannon's counsel did not present a voluntary intoxication defense because "he wasn't intoxicated at the crime scene. It was irrelevant [because] he wasn't there."
[32] Dr. Crown testified that, concerning the many subtest scores involved in the Wechsler test of a normal individual, a great deal of homogeneity is expected between the scores. However, Hannon's scores were greatly scattered from "roughly the 8th or 9th percentile all the way up to the roughly 98th percentile." He scored lowest on the "battery most sensitive to the identification of brain damage."